777 A.2d 19

BOROUGH OF PRINCETON, A MUNICIPAL CORPORATION, PLAINTIFF–RESPONDENT, v. BOARD OF CHOSEN FREE-HOLDERS OF THE COUNTY OF MERCER AND MERCER COUNTY IMPROVEMENT AUTHORITY, DEFENDANTS–AP-PELLANTS, AND WASTE MANAGEMENT OF PENNSYLVA-NIA, INC., DEFENDANT–INTERVENOR–APPELLANT.

AMERICAN REF–FUEL COMPANY OF ESSEX COUNTY, PLAIN-TIFF–RESPONDENT, v. MORRIS COUNTY MUNICIPAL UTILI-TIES AUTHORITY AND WASTE MANAGEMENT OF PENN-SYLVANIA, INC., DEFENDANTS–APPELLANTS.

Argued March 12, 2001—Decided July 23, 2001.

138

*Sandra T. Ayres* argued the cause for appellant Waste Management of Pennsylvania, Inc. (*Schwartz, Tobia, Stanziale, Rosensweig & Sedita,* attorneys).

*Joseph J. Maraziti, Jr.,* argued the cause for appellant Morris County Municipal Utilities Authority (*Maraziti, Falcon & Healey,* attorneys; *Brent T. Carney* and *Kimberly A. Kearney,* on the briefs).

*Michael R. Cole* argued the cause for appellant Mercer County Improvement Authority and *Alfred B. Vuocolo, Jr.,* Mercer County Counsel, argued the cause for appellant Board of Chosen Freeholders of the County of Mercer (*DeCotiis, Fitzpatrick, Gluck, Hayden & Cole* and *Mr. Vuocolo,* attorneys; *Andrew Bayer* and *Gregory J. Bevelock,* on the briefs)

*Lewis P. Goldshore* argued the cause for respondent Borough of Princeton (*Szaferman, Lakind, Blumstein, Watter, Blader, Lehmann & Goldshore,* attorneys; *Robert J. Cash,* on the briefs).

*Ross A. Lewin* argued the cause for respondent American Ref Fuel Company of Essex County (*Windels Marx Lane & Mittendorf,* attorneys; *Mr. Lewin* and *Charles M. Fisher,* on the briefs).

*Leslie Dannin Rosenthal,* Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

STEIN, J.

The Local Public Contracts Law (LPCL), *N.J.S.A.* 40A:11–1 to 50, requires that certain contracts entered into by local public entities be procured through a public bidding process detailed in that statute. The LPCL exempts a number of transactions from the public bidding requirement, including contracts for "real prop-

erty or any interest therein." *N.J.S.A.* 40A:11–2(4). In these consolidated appeals, defendants Mercer County (Mercer) and Morris County (Morris) argue that the LPCL did not require them to bid publicly contracts they entered into with defendant-intervenor Waste Management of Pennsylvania, Inc. (Waste Management) for disposal of the counties' solid waste, because the respective contracts granted, in part, easement rights on landfill space owned by Waste Management. The Appellate Division held that both contracts were subject to the LPCL bidding requirements, notwithstanding their purported grants of property rights, because the transactions also required Waste Management to perform services, and, taken as a whole, the "entire thrust" of the contracts were "that of a contract for solid waste disposal." *Borough of Princeton v. Board of Chosen Freeholders of Mercer County,* 333 *N.J.Super.* 310, 327, 755 *A.*2d 637 (App.Div.2000). We granted certification, 165 *N.J.* 676, 762 *A.*2d 657 (2000), and now affirm.

I

We begin with some brief background. In 1970, the Legislature enacted the Solid Waste Management Act (SWMA), *N.J.S.A.* 13:1E–1 to –207, and the Solid Waste Utility Control Act (SWU-CA), *N.J.S.A.* 48:13A–1 to –13, in an effort to establish a comprehensive regulatory framework for the disposal of solid waste in New Jersey. *See Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County,* 48 *F.*3d 701, 704–08 (3d Cir.1995) (detailing solid waste disposal system created by SWMA and SWUCA). In accordance with those statutes, the State was divided into twenty-two solid waste management districts, including all twenty-one counties and a "Hackensack Meadowlands" district. *N.J.S.A.* 13:1E–20. Each district was assigned the responsibility for developing and implementing a long-term solid waste management plan, subject to approval by the State Department of Environmental Protection (DEP). *N.J.S.A.* 13:1D–19; 13:1E–20, –24.

In 1997, the United States Court of Appeals for the Third Circuit held unconstitutional, under the dormant Commerce Clause doctrine, elements of the SWMA and SWUCA that imposed heightened requirements on districts that desired to contract with out-of-state operators of solid waste disposal facilities. *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County,* 112 *F.*3d 652, 667 (3d Cir.), *cert. denied,* 522 *U.S.* 967, 118 *S.Ct.* 413, 139 *L.Ed.*2d 316 (1997), *amended,* 135 *F.*3d 891 (3d Cir.1998) (*Atlantic Coast II*). In the wake of that decision, the DEP issued an order in August 1997 requiring all solid waste disposal districts to review their strategies in view of the *Atlantic Coast II* mandate and, if necessary, adopt plan amendments. Mercer and Morris had entered into contracts with Waste Management for long-term solid waste disposal prior to *Atlantic Coast II,* in 1988 and 1993, respectively.[1] In response to the DEP order, the counties both certified that they were in compliance with *Atlantic Coast II,* and the present suits were brought following those certifications.

A

Mercer enacted its original solid waste management plan in 1979. The long-term objective of that plan was for the county to be "self-sufficient" in its treatment and disposal of solid waste. Accordingly, the plan proposed the development of both an in-county resource recovery facility for processible waste and a landfill to deposit ash residue and non-processible waste. In the late 1980's, however, Mercer abandoned its intention to develop an

---

[1] We note that Mercer and Morris both acted through independent authorities (the Mercer County Improvement Authority and the Morris County Municipal Utilities Authority, respectively) to achieve their waste management goals. Moreover, certain relevant facts in these petitions involve corporations that were subsidiary to or affiliated with Waste Management. Neither the statutory distinctions between the authorities and counties nor the relationship between Waste Management and its affiliates/subsidiaries are germane to the issues raised in these petitions. Accordingly, for ease of understanding we will refer only to the counties and to Waste Management.

in-county landfill, and in 1987 the county entered into negotiations for long-term solid waste disposal services with four specific companies that it believed possessed the capabilities to store the county's waste outflow. Mercer ultimately selected Waste Management, a Pennsylvania corporation, after Waste Management obtained long-term disposal capacity from the Commonwealth of Pennsylvania. Mercer's efforts to develop a resource recovery facility also were abandoned in November 1996, after the county failed to pass a plan amendment that would have authorized a $67 million bond issue to finance the construction of a resource-recovery facility in Hamilton Township. At present, Mercer's solid waste is directed to Waste Management's landfills, apparently without resource-recovery processing, through a transfer station located in Ewing Township.

Mercer and Waste Management executed a "License Agreement" on February 17, 1988. The agreement grants to Mercer "all rights, title and interest in an irrevocable, non-exclusive license which shall run with the land," and an attachment to the agreement provides a metes and bounds description of the landfill area, located in Bucks County, Pennsylvania. The agreement requires Waste Management to accept a maximum of 4,500,000 tons of solid municipal waste, and to provide "all necessary services at the Landfill Facilities to receive such Acceptable Waste," including taking all measures required by law to bury, cover or otherwise process the waste. The agreement defines "Landfill Facilities" as

> the Landfill and all other facilities related thereto, including, without limitation, liners, protective covers, leachate collection and treatment facilities, storm water collection and treatment facilities, erosion and sedimentation control facilities, gas vents, gas collection systems, borrow areas, offices, haul roads, equipment, gear and other tangible property used in connection with the operation of the Landfill.

The agreement provides further that if the "rate of depletion of the remaining capacity" of the landfill could cause Waste Management to default on any of its contractual obligations, Waste Management is required to "mak[e] available to [Mercer] additional landfills to which [Mercer] is granted by [Waste Management]

license rights identical to such rights granted pursuant to this Agreement in the Landfill, except as to location."

In return, Mercer made an initial payment to Waste Management of $30 million, and agreed to make monthly "service fee purchase payments" equal to $47 per ton of accepted waste plus certain operating costs. The per-ton purchase payments increase for specific types of waste, such as "Baled Waste" and "Special Waste," that are defined in the agreement. The original agreement extended for a period of twenty-five years from the date of the first service fee purchase payment, or until Mercer exhausted its maximum deposit amount of 4,500,000 tons of waste, whichever occurred first.

The agreement was not affected adversely by *Atlantic Coast II* because Waste Management, as an out-of-state company, had not been disadvantaged by the regulatory scheme invalidated by that decision. Nevertheless, in August 1997 Mercer adopted a resolution recommending certain amendments to its solid waste management plan, including modifications to the Waste Management contract. The proposed amendment, agreed to by Waste Management, authorized modification of the license agreement by reducing its term from twenty-five to nineteen years and reducing Mercer's monthly per-ton service fee purchase payments. Mercer adopted the plan amendment after holding public hearings, and in November 1997 the DEP approved the aspects of the plan amendment that are relevant to this review. The amended license agreement went into effect on November 10, 1997.

In September 1997, plaintiff Borough of Princeton (Princeton) filed a complaint in lieu of prerogative writs in the Law Division against Mercer. Princeton's original complaint alleged that the process undertaken to promulgate the 1997 plan amendment violated procedural requirements set forth in the SWMA. The Law Division granted Waste Management's motion to intervene. After hearing arguments on the defendants' motions to dismiss, but without issuing any dispositive order, the Law Division transferred the entire case to the Appellate Division. Simultaneous

with that order, the Law Division granted Princeton's motion to amend its complaint to include an allegation that the original 1988 license agreement, and the 1997 amendment, were invalid because they were not bid publicly pursuant to the LPCL. In December 1997, Princeton filed a separate action in the Appellate Division challenging the DEP administrative order approving the Mercer plan amendment.

## B

The events leading to the Morris agreement with Waste Management began in October 1992, when Morris published a "Request for Proposals" seeking a solid waste disposal contract with an out-of-state landfill for 4.5 million tons of waste. Morris issued a public notice advertising the request. After receiving responses, Morris published an addendum addressing various clarification questions posed by interested companies. Among the questions received was "[w]hat is the legal basis for acquiring the Easement without compliance with the provisions of the Local Public Contracts Law (*N.J.S.A.* 40A:11–1 *et seq.*)?" Morris replied that the proposed transaction "has been structured as an acquisition of an interest in real property," and that "acquisition of the Easement does not constitute the performance of work or the furnishing or hiring of any materials or supplies. As such, the provisions of the Local Public Contracts Law are not applicable to this process."

Morris received five proposals. In December 1992, a team of experts hired by Morris to evaluate the competing proposals recommended that the County accept the proposal submitted by Waste Management. Following that recommendation, the county executed an agreement with Waste Management on January 6, 1993 for the "Acquisition of an Undivided Interest in Real Property, Consisting of the Acquisition of Certain Easement Rights Relating Thereto." [2]

---

[2] One of the other entities that submitted a competing proposal, Empire Sanitary Landfill, Inc. (Empire), commenced an action in lieu of prerogative

The agreement grants to Morris "all rights, title and interest to an undivided interest in the Premises owned by the Grantor, consisting of the acquisition of certain easement rights relating thereto, which shall run with the land." The agreement describes the landfill area subject to the easement in metes and bounds, and provides for the recording of the easement with "the appropriate county, municipal or state office responsible for recording transfers of real property." The agreement authorizes Morris to deposit a maximum of 4.5 million tons of solid waste on the landfill area over a ten-year period beginning January 1, 1995, with an option to extend the term of the easement for another five years with a corresponding increase in the maximum waste load. In return, Morris made an initial payment to Waste Management of $1,000,000, and is responsible for a monthly "deferred purchase payment," which includes primarily a "Unit Charge" based on tonnage of waste disposed at the landfill facilities. The agreement, like the Mercer agreement, assigns different per-ton dollar amounts based on the composition of the waste to be disposed of, with a per-ton charge of $33.00 for "Municipal Waste and Non Municipal Waste" and higher charges, ranging from $47.05 to $49.00 per-ton, for "Bulky Waste," "Baled Waste," and "Residue."

The agreement obligates Waste Management to maintain all permits necessary to provide for the disposal of Morris's waste, and to take "all steps required by Applicable Law to bury, grade, cover and otherwise process all Acceptable Waste deposited in the Landfill." Waste Management has the sole responsibility under the contract to operate the "Landfill Facilities," which the contract defines—in language nearly identical to the Mercer agreement—to include

---

writs shortly after the contract was signed challenging the award to Waste Management. Empire argued, in part, that the contract was invalid because it was not bid pursuant to the LPCL. The Law Division denied Empire's request for temporary injunctive relief, finding that the contract was not subject to the LPCL because it granted an interest in real property, while conceding that its holding involved "a somewhat artificial analysis." Empire did not appeal that ruling and the parties agreed to dismiss the case with prejudice.

the Landfill and all other facilities related thereto, including, without limitation, liners, protective covers, leachate collection and treatment facilities, stormwater collection and treatment facilities, erosion and sedimentation control facilities, gas vents, gas collection systems, borrow areas, offices, haul roads, truck weigh scale, equipment, gear and other tangible property used in connection with the operation of the Landfill.

The agreement states that Morris "shall have no duties, obligations, responsibilities or rights of any nature with respect to the operation, maintenance, design, construction or management of the Landfill or Landfill Facilities."

In addition to the metes and bounds description of the easement area, the agreement requires Waste Management to "continue to construct and add to the Landfill and Landfill Facilities, as and when necessary, in order to enable [Waste Management] to accept the unused portion of the Maximum Waste Amount." The contract specifies further that if "as a result of issuance of a Governmental Order ... [Waste Management] is prohibited from accepting any Acceptable Waste for deposit in the Premises, [Waste Management] shall ... make additional landfill sites available to [Morris] for the disposal of ... Acceptable Waste." The contract specifies that "all terms and conditions contained in this Agreement" would apply to the additional landfill space with the single exception of "the provisions ... relating to the acquisition of a[n] Easement."

The agreement was recorded shortly after it was signed, and in March 1993 Morris enacted a plan amendment incorporating the agreement into its waste management plan. The DEP approved the amendment in December 1994, subject to the condition that Morris amend its plan to provide for long-term use of in-state waste disposal facilities. After *Atlantic Coast II* was decided, however, the DEP withdrew that condition.

Morris, like Mercer, originally had planned to build a resource-recovery facility within the county but ultimately abandoned that plan. Accordingly, in 1994 Morris entered into a contract with Essex County for use of a resource recovery facility that is located in Newark and operated by plaintiff American Ref–Fuel Company

of Essex County (American Ref–Fuel). The contract provided that Morris would deliver all of its solid waste, up to a maximum of 225,000 tons, to the Essex County facility. After that contract was incorporated into Morris's plan amendment, Waste Management filed suit in the Law Division alleging that under its 1993 contract with Morris the county was required to dispose of all of its solid waste at the Waste Management landfills, and could not rely on another out-of-county provider for resource recovery services. The Law Division rejected that claim, holding that Morris was free to use the Essex facility as long as a proportional share of non-processible waste and ash was transferred to the Waste Management landfills.

In the wake of *Atlantic Coast II*, Morris determined that its contract with Waste Management was in compliance with the *Atlantic Coast II* mandate. Accordingly, in December 1997 Morris submitted a request for administrative action, *N.J.A.C.* 7:26–6.11(b)(9), petitioning the DEP to reaffirm Morris's reliance on the 1993 Waste Management contract. The following month, the DEP issued an administrative action confirming that the 1993 agreement complied with *Atlantic Coast II* and reaffirming the agreement as an element of Morris's solid waste management plan.

In February 1998, American Ref–Fuel filed a direct appeal in the Appellate Division challenging the DEP administrative action. Two months later, American Ref–Fuel filed a complaint in lieu of prerogative writs in the Law Division challenging the 1993 agreement between Morris and Waste Management as being in violation of the LPCL public bidding requirement. The Law Division granted Waste Management's motion to intervene, and then granted summary judgment to defendants on all counts. The court did not resolve the question whether the agreement should have been bid publicly pursuant to LPCL requirements, finding it a "very arguable debatable question." Instead, the court granted summary judgment on the basis of American Ref–Fuel's delay in bringing the LPCL claim. The court emphasized defendants'

interest in "repose with respect to long-standing arrangements," and noted that the bidding process undertaken by Morris, although not in compliance with the LPCL, was nevertheless an open process: "[t]here's absolutely nothing hidden or mysterious about this arrangement. It may have been controversial in the sense that people had policy differences about it, but there was no favoritism or preferential treatment at all involved in this case."

American Ref–Fuel filed a timely appeal of the Law Division order granting summary judgment.

## II

The Appellate Division consolidated the various Mercer and Morris appeals, *R.* 4:38, finding that they involved "related issues concerning solid waste disposal." *Borough of Princeton, supra,* 333 *N.J.Super.* at 315, 755 *A.*2d 637. In a unanimous opinion, the court held that the Princeton and American Ref–Fuel complaints filed in the Law Division were not barred on timeliness grounds, and that both the Mercer and Morris agreements were invalid because they were not bid publicly pursuant to the LPCL.

With respect to timeliness, the court recognized that actions in lieu of prerogative writs "generally have to be commenced within forty-five days 'after the accrual of the right to the review, hearing or relief claimed.'" *Id.* at 322, 755 *A.*2d 637 (quoting *R.* 4:69–6(a)). The court was "entirely satisfied," *ibid.,* however, that the forty-five day time frame should be enlarged pursuant to *Rule* 4:69–6(c), which allows for enlargement "where it is manifest that the interest of justice so requires." *R.* 4:69–6(c). The court emphasized "this State's long history of concern about the possibilities of abuse in the solid waste industry," *ibid.,* and noted specifically both the length and costs involved in both contracts and the fact that "[o]ther counties . . . have attempted to negotiate similar agreements." *Id.* at 324, 755 *A.*2d 637. The court also emphasized that the issues raised in the complaints "cannot be separated, in any analytically sound way," from the challenges to the 1997 DEP approvals of the Mercer and Morris plans. *Id.* at

323, 755 *A*.2d 637. In view of those factors, the court concluded that "the public interest ... would not be served by invoking a rigid deadline beyond which the expenditure of millions of public dollars over an extended period of years would be immune from judicial scrutiny." *Id.* at 322–23, 755 *A*.2d 637. The court recognized "that considerations of fairness to the parties and stability in public affairs should not be disregarded," but determined that considerations of fairness could be addressed "during the process of crafting a remedy." *Id.* at 323, 755 *A*.2d 637.

The court then turned to plaintiffs' claim that the Mercer and Morris agreements were invalid because they were not bid publicly pursuant to the LPCL. When those agreements were executed, the LPCL provided in relevant part that

[e]very contract or agreement for the performance of any work or the furnishing or hiring of any materials or supplies, the cost or the contract price whereof is to be paid with or without public funds ... shall be made or awarded only by the governing body of the contracting unit after public advertising for bids and bidding therefor, except as is provided otherwise in this act or specifically by any other law.

[*L.* 1985, *c.* 60, § 2, *amended by L.* 1999, *c.* 440, § 8.3]

The LPCL specifies a number of requirements for contracts subject to public bidding, including requirements relating to the drafting of bid specifications, *N.J.S.A.* 40A:11–13, and to the contracting unit's determination of which bid to accept. *N.J.S.A.* 40A:11–6.1. The bidding requirement applied to contracts exceeding $7,500, and that threshold amount subsequently has been increased to $17,500. *L.* 1985, *c.* 469, § 7, *amended by L.* 1999, *c.* 440, § 7. The statute exempts certain categories of transactions entirely from the bidding process, including contracts for professional services, *N.J.S.A.* 40A:11–5(1)(a)(i), contracts for the marketing of recyclable materials, *N.J.S.A.* 40A:11–5(1)(s), and, critical for our purposes, contracts for "real property or any interest therein." *N.J.S.A.* 40A:11–2(4).

---

[3] The LPCL has been amended in a number of respects since the Mercer and Morris contracts were enacted, but none of the amendments are material to our analysis.

The Appellate Division began its analysis by defining the general requirements for creating easement rights in contracts, noting that "[b]ecause the parties' claim to an easement arises from their respective written agreements, we must analyze those agreements to determine if they indeed contain the elements of an easement and reflect an intent to create an easement." *Borough of Princeton, supra,* 333 *N.J.Super.* at 324–25, 755 *A.*2d 637. The court did not, however, resolve the question whether the contracts created legal easements. Instead, it held that, notwithstanding the language purporting to grant easement rights, both agreements were subject to the LPCL because they involved the performance of services: "[h]aving reviewed these documents ... we are satisfied that their entire thrust, apart from using the terminology 'easement' and providing for their recordation, is that of a contract for solid waste disposal services." *Id.* at 325, 755 *A.*2d 637. The court stressed certain elements of the agreements-including Waste Management's obligations to maintain the landfill facilities and to expand the size of the landfills, and the counties' obligations to pay Waste Management on the basis of the nature of the waste deposited-and found that "the conclusion is inescapable that the counties were envisioning contracts for solid waste disposal and that they entered [into] contracts for solid waste disposal, albeit clothed in different raiment." *Id.* at 327, 755 *A.*2d 637. Emphasizing this State's "long tradition of requiring open and free competitive bidding for public contracts," *id.* at 328, 755 *A.*2d 637, the court concluded that neither of the agreements "creates an easement such as would exempt the transactions from the requirements of the Local Public Contracts Law." *Ibid.*

Rather than ordering that the agreements be set aside immediately, the court remanded to the Law Division to set "a realistic but firm date ... for the counties to propose a fair method of disengagement." *Id.* at 331, 755 *A.*2d 637. The court noted that it had an "inadequate record upon which to determine what remedies may be appropriate in this unique situation," and recognized that "suddenly disrupting a county's established method of

disposing its solid waste does not adequately protect the interests of the affected citizens." *Id.* at 330, 755 *A.*2d 637.

In view of its disposition of the LPCL issue, the court declined to address issues relating to the DEP approvals of the Mercer and Morris plan amendments. *Ibid.* The court also rejected without discussion an argument by Waste Management that the Law Division erred in allowing Princeton to amend its complaint to allege a violation of the LPCL. *Ibid.*

### III

We address first defendants' contention that the complaints in lieu of prerogative writs filed by American Ref Fuel and Princeton are time-barred because they were brought in excess of forty-five days after the agreements were enacted. *Rule* 4:69–6(a) of the Rules Governing Civil Practice provides that "[n]o action in lieu of prerogative writs shall be commenced later than 45 days after the accrual of the right to the review, hearing or relief claimed." Princeton and American Ref–Fuel filed their complaints approximately nine years and five years, respectively, after the Mercer and Morris agreements were signed. Plaintiffs argue, however, that the forty-five day period should be enlarged pursuant to *Rule* 4:69–6(c), which authorizes enlargement "where it is manifest that the interest of justice so requires." *R.* 4:69–6(c).

This Court previously has defined three general categories of cases that qualify for the "interest of justice" exception: "cases involving (1) important and novel constitutional questions; (2) informal or *ex parte* determinations of legal questions by administrative officials; and (3) important public rather than private interests which require adjudication or clarification." *Brunetti v. Borough of New Milford,* 68 *N.J.* 576, 586, 350 *A.*2d 19 (1975). The Court has added that one of the "[o]ther factors that will ordinarily guide courts include whether there will be a continuing violation of public rights." *Reilly v. Brice,* 109 *N.J.* 555, 559, 538 *A.*2d 362 (1988) (citing *Jones v. MacDonald,* 33 *N.J.* 132, 138, 162 *A.*2d 817 (1960)). Balanced against those interests "is the

important policy of repose expressed in the forty-five day rule. The statute of limitations is designed to encourage parties not to rest on their rights." *Ibid.*

We are convinced that review of the merits of plaintiffs' LPCL claims is warranted under *Rule* 4:69–6(c). Several specific considerations inform our analysis. First, we note that the Mercer and Morris agreements extend for terms of fifteen and nineteen years, respectively. Section 15 of the LPCL imposes duration limits on all contracts subject to the act's public bidding rules, including a five-year maximum duration for contracts involving "[t]he collection and disposal of municipal solid waste." *N.J.S.A.* 40A:11–15(3). The Mercer and Morris agreements are, therefore, ten and fourteen years longer than the LPCL would authorize for such contracts.

Defendants observe that the LPCL authorizes a maximum duration of forty years for contracts involving "[t]he provision of resource recovery services by a qualified vendor" or "the disposal of solid waste delivered for disposal which cannot be processed by a resource-recovery facility." *N.J.S.A.* 40A:11–15(17). The Mercer and Morris agreements clearly, however, do not qualify for the forty-year duration limit. Waste Management does not provide resource recovery services under either agreement, and both agreements oblige Waste Management to accept the counties' municipal solid waste irrespective of whether it is capable of being treated at a resource recovery facility.

By requiring that contracts subject to the Act be open to re-bidding on a regular basis, the LPCL contract duration limits provide increased opportunity for companies that are new to the relevant market, or have become more competitive within it, to compete for public contracts and provide a potentially more favorable package of services to the public. Likewise, the limits ensure that the public does not find itself bound in the long-term to contracts that, while advantageous at the time of execution, become unfavorable as a consequence of changes in market conditions. Thus, if the Mercer and Morris agreements are found to be

subject to the LPCL, the extended duration of the agreements would work to impose "a continuing violation of public rights," *Reilly, supra,* 109 *N.J.* at 559, 538 *A.*2d 362, because the reduction in competition resulting from the extended term of the agreements constitutes a continuing impairment both of the solid waste management industry's right under the LPCL to the regular re-bidding of public contracts, and of the public's right to the protections afforded by an open market.[4]

Defendants counter that the Mercer and Morris agreements, in fact, constitute favorable transactions for the public, and re-bidding would result in higher rates for the respective counties. However, the parties in both cases presented conflicting affidavits and documentation in the Law Division on the relative costs and benefits of re-bidding. Considering the enormity of the sums involved in these agreements—the record indicates that the monthly payments made by Mercer and Morris under the agreements both aggregate to several millions of dollars per year—we decline from our vantage point to gauge the solid waste disposal market. We can assume only what the LPCL assumes—that open and regular competition for solid waste disposal contracts is the best method for ensuring that the public enjoys the most favorable contract terms that are available in that market. *See, e.g., Hillside v. Sternin,* 25 *N.J.* 317, 326, 136 *A.*2d 265 (1957)

---

[4] To highlight the point, the Law Division noted below in the American Re-Fuel case that American Re Fuel "wasn't in a position to make a bid in 1992" because regulations in place at that time, which were repealed in 1997, required an inter-district agreement between adjacent solid waste management districts before one district could enter into a waste disposal agreement with a provider located within another. *See N.J.S.A.* 13:1E–21(b)(3) (stating that district may enter into disposal agreement with company located in adjacent district "with the approval of said adjacent district"); New Jersey Department of Environmental Protection, *Guidance Document in Response to the May 1, 1997 Court Decision on Solid Waste Flow Control* 7 (August 1997) (noting that DEP would "not be requiring [future interdistrict agreements] in order to move waste from a generating county to a receiving county."). American Re–Fuel submitted affidavits in the Law Division indicating that the cost involved in reaching such an inter-district agreement would have effectively defeated any effort by American Re–Fuel to bid for the Morris contract proposal in 1992.

(noting that public bidding laws must be enforced regardless of whether negotiated contract was "reasonable" or "as advantageous to the city as any other contract which it will be likely to secure") (citations and quotation marks omitted).

Beyond the duration of the agreements, we note also that the agreements, and the foundation for plaintiffs' challenges to them, both include issues that we have identified previously as involving unique public policy concerns. This Court has emphasized the importance of the LPCL to " 'secure for the public the benefits of unfettered competition,' and to 'guard against favoritism, improvidence, extravagance, and corruption.' " *National Waste Recycling, Inc. v. Middlesex County Improvement Auth.*, 150 *N.J.* 209, 219, 695 *A.*2d 1381 (1997) (quoting *Terminal Constr. Corp. v. Atlantic County Sewerage Auth.*, 67 *N.J.* 403, 410, 341 *A.*2d 327) (1975)). The practice of public bidding "is universally recognized and deeply embedded in the public policy of this State." *N.E.R.I. Corp. v. New Jersey Highway Auth.*, 147 *N.J.* 223, 236, 686 *A.*2d 328 (1996), *see also Hillside, supra*, 25 *N.J.* at 326, 136 *A.*2d 265 (noting that public bidding is "rooted deep in the sound principles of public policy") (citations omitted). Those considerations have particular force in the context of solid waste management contracts, which this Court has described as being "fraught with the potential for abuse in the form of favoritism, rigged bids, official corruption and the infiltration of organized crime." *In re Application of Saddle River*, 71 *N.J.* 14, 22, 362 *A.*2d 552 (1976). Consequently, if a party has shown a potential violation of the LPCL public bidding requirements—especially with respect to contracts involving the cost, duration and subject matter of the Mercer and Morris agreements—the concerns at stake provide a strong motivation for courts to reach beyond timeliness barriers and adjudicate the merits.

In view of both the policies underlying the LPCL and the unique circumstances surrounding the Mercer and Morris agreements, we perceive in these petitions "important public ... interests which require adjudication or clarification." *Brunetti, supra*,

68 *N.J.* at 586, 350 *A.*2d 19. Our determination to reach the merits is bolstered by the likelihood, suggested in the record, that other solid waste management districts have entered into contracts similar to the Mercer and Morris agreements. If the potential injuries alleged in these petitions are being multiplied in other agreements throughout this State, we find it most prudent to resolve the underlying legal issues now.[5]

Defendants have emphasized their interest in repose. We recognize that defendants have relied on the Mercer and Morris agreements for a number of years, and that they may have made decisions in reliance on the continuing enforceability of the rights created by those agreements. Nevertheless, we find the potential prejudice to the public that would result from not reaching the merits in these petitions to outweigh any prejudice that defendants might suffer by our disposition. As the Appellate Division noted below, considerations of fairness can be "appropriately considered during the process of crafting a remedy, should that prove necessary, rather than serve to bar examination of the underlying issue completely." *Borough of Princeton, supra,* 333 *N.J.Super.* at 323, 755 *A.*2d 637.

In addition to arguing that plaintiffs' complaints are time-barred, Waste Management contends that American Ref–Fuel lacks standing to bring suit and that Princeton's suit is barred by the doctrines of laches and unclean hands. The Appellate Division did not address those arguments, but because they were raised in Waste Management's petition we will consider them briefly here.

---

[5] Plaintiffs make a number of other arguments to support review of their claims notwithstanding the delay, including (1) that the counties acted *ultra vires* in awarding the Waste Management contracts without using the LPCL bidding process, (2) that the contracts can be challenged anew whenever monthly payments are made to Waste Management, and (3) that the contracts were open to challenge after Mercer and Morris amended their plans in response to *Atlantic Coast II*. In view of our reliance on Rule 4:69–6(c), we need not reach the substance of those arguments.

■ Waste Management contends that American Ref–Fuel has
not shown an injury that would give it standing to challenge the
Morris agreement because "the 1993 Agreement does not prevent
Morris ... from directing processible waste to Ref–Fuel's RRF
[ (resource recovery facility) ]" in Essex County. As noted, how-
ever, Waste Management sued Morris in 1994 after Morris en-
tered into an agreement with Essex County to dispose of certain
portions of its waste at American Ref–Fuel's Newark resource
recovery facility. The Law Division's Final Judgment in that
matter ordered Morris to dispose at the Waste Management
landfill "all Acceptable Waste generated within the geographic
boundaries of Morris County required to be landfilled, including
by-passed and non-processible waste and the pro-rata portion of
ash ... that remains after Acceptable Waste generated within ...
Morris County is processed" at a resource recovery facility.
Thus, American Ref–Fuel clearly is precluded by the terms of the
Morris agreement from receiving for disposal the bulk of the
waste generated in Morris County. That fact constitutes an
injury that satisfies our standing jurisprudence. *See, e.g., In re
Charter School Application of Englewood,* 320 *N.J.Super.* 174,
222, 727 *A.*2d 15 (App.Div.1999), *aff'd,* 164 *N.J.* 316, 753 *A.*2d 687
(2000) (noting that to determine whether standing exists, court
must determine "whether the party has a sufficient stake in and
real adverseness with respect to the subject matter, and whether
the party will be harmed by an unfavorable decision.").

■ With respect to Princeton, Waste Management argues
that Princeton is barred by the doctrines of laches because of the
length of the delay in bringing its complaint. We have noted
recently that "[l]aches is an equitable defense that may be inter-
posed in the absence of the statute of limitations," and is defined
as "an inexcusable delay in asserting a right." *Northwest Cove-
nant Med. Ctr. v. Fishman,* 167 *N.J.* 123, 140, 770 *A.*2d 233 (2001)
(quotation marks omitted). Factors considered in determining
whether to apply laches include "the length of delay, reasons for
delay, and changing conditions of either or both parties during the

delay." *Id.* at 141, 770 *A.*2d 233 (quotation marks omitted). However, the "central issue" in determining whether the laches doctrine bars a lawsuit "is whether it is inequitable to permit the claim to be enforced." *Lavin v. Board of Educ. of Hackensack,* 90 *N.J.* 145, 152–53, 447 *A.*2d 516 (1982). In view of our discussion above, we find that the equities in this case weigh in favor of allowing the Princeton suit to proceed, and the laches doctrine therefore does not bar review of the merits.

 Waste Management argues that the doctrine of "unclean hands" precludes Princeton from bringing suit because the Borough of Princeton is located within Mercer County, and therefore Princeton has benefitted from the Mercer agreement in the years since it was executed. We find no basis in the Princeton case for application of the doctrine of unclean hands. The essence of that doctrine, which is "discretionary on the part of the court," *Heuer v. Heuer,* 152 *N.J.* 226, 238, 704 *A.*2d 913 (1998), is that "[a] suitor in equity must come into court with clean hands and he must keep them clean after his entry and throughout the proceedings." *A. Hollander & Son, Inc. v. Imperial Fur Blending Corp.,* 2 *N.J.* 235, 246, 66 *A.*2d 319 (1949). "In simple parlance, it merely gives expression to the equitable principle that a court should not grant relief to one who is a wrongdoer with respect to the subject matter in suit." *Faustin v. Lewis,* 85 *N.J.* 507, 511, 427 *A.*2d 1105 (1981). Apart from Princeton's delay in bringing suit, Waste Management has not indicated that Princeton has acted improperly with respect to this litigation or the Mercer agreement. Delay in itself, while perhaps an appropriate basis for rejecting a claim pursuant to the laches doctrine, does not establish "unclean hands" for purposes of our jurisprudence.

IV

 We turn, then, to the question whether the Mercer and Morris agreements should have been bid publicly pursuant to the LPCL. As noted, at the time the agreements were entered into, the LPCL required public bidding, pursuant to rules specified in

the act, for all contracts "for the performance of any work or the furnishing or hiring of materials or supplies" that involved the expenditure of more than $7,500 in public funds. *L.* 1985, *c.* 469, § 7. The act defined the term "work" expansively to include "services and any other activity of a tangible or intangible nature performed or assumed pursuant to a contract or agreement with a contracting unit." *L.* 1987, *c.* 102, § 30 (subsequent amendments omitted). However, the LPCL exempts altogether a number of contract types from the public bidding requirement, including contracts for "real property or any interest therein." *N.J.S.A.* 40A:11–2(4).

The essence of defendants' position is that because the Mercer and Morris contracts purported to grant to the counties interests in real property owned by Waste Management, the contracts are exempt from the LPCL public bidding requirement pursuant to the *N.J.S.A.* 40A:11–2(4) exception. In their briefs and at oral argument, defendants have emphasized their view that the agreements created *bona fide* easements, and that it was essential for the counties to acquire interests in property because such interests would, for instance, protect the counties against interference by the Commonwealth of Pennsylvania, authorize specific performance in the event of breach by Waste Management, and provide to the counties certain benefits with respect to creditor law. We need not resolve, however, whether the agreements create *bona fide* property rights, or whether such rights would provide the protection that defendants claim. Even if the agreements create such rights, those qualities do not overcome the fact that the agreements also involve substantial service obligations on the part of Waste Management. The question for our review is whether the agreements, taken as a whole, should be characterized, for purposes of the LPCL, as contracts for "real property or any interest therein," *N.J.S.A.* 40A:11–2(4), or as contracts "for the performance of any work." *L.* 1987, *c.* 102, § 30.

We have noted that "[p]ublic bidding statutes exist for the benefit of taxpayers, not bidders, and should be construed with

sole reference to the public good." *National Waste, supra,* 150 *N.J.* at 220, 695 *A.*2d 1381 (citations omitted). Accordingly, this Court has curtailed "the discretion of local authorities by demanding strict compliance with public bidding guidelines." *L. Pucillo & Sons, Inc. v. Mayor and Council of the Borough of New Milford,* 73 *N.J.* 349, 356, 375 *A.*2d 602 (1977) (citations omitted). *See also Autotote Ltd. v. New Jersey Sports & Exposition Auth.,* 85 *N.J.* 363, 370, 427 *A.*2d 55 (1981) (noting that courts have construed LPCL strictly "so as not to dilute [public policy] or permit a public body to avoid pertinent legislative enactments"); *Kurman v. City of Newark,* 124 *N.J.Super.* 89, 94, 304 *A.*2d 768 (App.Div.) ("Statutes calling for public bidding . . . should be construed with sole reference to the public good and rigidly adhered to by the court."), *certif. denied,* 63 *N.J.* 563, 310 *A.*2d 477 (1973). "Nevertheless, 'the exceptions should not be read out of the statute,' thereby frustrating the intent of the Legislature in its grant of power to the contracting authority." *National Waste, supra,* 150 *N.J.* at 223, 695 *A.*2d 1381 (quoting *Autotote, supra,* 85 *N.J.* at 376, 427 *A.*2d 55 (Pashman, J., concurring)).

As noted, both the Mercer and Morris agreements, which are substantially similar, grant explicit interests in property to the respective counties—the Mercer agreement grants to Mercer "all rights, title and interest in an irrevocable, non-exclusive license which shall run with the land," and the Morris agreement grants to Morris "all rights, title and interest to an undivided interest in the Premises owned by Grantor, consisting of the acquisition of certain easement rights relating thereto, which shall run with the land." The bulk of the obligations under the agreements, however, are service obligations undertaken by Waste Management. As noted, Waste Management is responsible under both agreements to, among other things, maintain liners, protective covers, burrow areas, and haul roads, and to operate leachate collection and treatment facilities, stormwater collection and treatment facilities, erosion and sedimentation control facilities, gas vents, and gas collection systems. The counties pay to Waste Management, on a monthly basis, a sum that is calculated on the basis of the

composition of the waste that Waste Management stores and treats that month. Perhaps most telling for our purposes, both agreements require Waste Management to provide additional landfill space, beyond that specified in the metes and bounds descriptions of the property grants, if the current landfill capacity subject to the "easement" is not sufficient to permit Waste Management to satisfy its contractual obligations.

Clearly, therefore, the agreements are not merely contracts for the acquisition of property rights. They deal predominantly with solid waste disposal services, both in terms of the obligations undertaken by Waste Management and the compensation provided in return by the respective counties. Defendants emphasize the language incorporated into the agreements, as well as their designated titles, that emphasize that the agreements confer a "License" and an "Easement" but make no mention of service obligations. That terminology does not, however, alter the overriding purposes of the agreements. To hold otherwise would permit stylistic drafting of language to transform contracts otherwise subject to the LPCL into a contract subject to one of the Act's narrow exceptions. "[I]t is axiomatic that statutory exemptions to public bidding requirements should be strictly construed so as not to dilute [the policy of public bidding] or permit a public body to avoid pertinent legislative enactments." *Autotote, supra,* 85 *N.J.* at 370, 427 *A.*2d 55.

The question in this case is not, in short, whether the Mercer and Morris agreements confer easements, but whether, understood as a whole, the defining quality of the agreements involves the creation of property interests or the establishment of an obligation to provide waste disposal services. Considering that the preponderance of both agreements relate exclusively to the provision of services, we hold that both agreements constitute, for purposes of the LPCL, service contracts and not contracts for "real property or any interest therein." *N.J.S.A.* 40A:11–2(4). Accordingly, the agreements are subject to the LPCL bidding requirements.

Our holding is supported by a notice issued to county agencies by the Division of Local Government Services in the New Jersey Department of Community Affairs (Division) in response to *Atlantic Coast II*. In that notice, which presumably was distributed to Morris and Mercer, the Division stated that the termination of historic waste flow controls "does not mean[ ] that municipalities may seek alternate sites for solid waste disposal without going through the procurement process. *If alternative disposal sites are pursued, the service must be procured in accordance with the Local Public Contracts Law." Letter from Beth Gates, Director, Division of Local Government Services, to Public Officials* 1 (November 1997) (emphasis added). That statement by the Division-an agency delegated by the LPCL with the authority to "assist contracting units in all matters affecting the administration of this law," *N.J.S.A.* 40A:11-37—is "entitled to deferential consideration," *National Waste, supra,* 150 *N.J.* at 228, 695 *A.*2d 1381, and explicitly contradicts defendants' position in this appeal.

Defendants emphasize the significance of *Autotote, supra,* 85 *N.J.* 363, 427 *A.*2d 55, but we find *Autotote* to be of marginal relevance. *Autotote* involved an award by the New Jersey Sports and Exposition Authority (Authority) to a private company, without public bidding, for the installation at the Meadowlands racetrack of a "totalisator system," described by the Court as a "complex computer network designed to tabulate and categorize the bets made on every horse in each race." *Id.* at 365, 427 *A.*2d 55. The New Jersey Sports and Exposition Authority Law (NJSEAL) provided at that time for the public bidding of all contracts entered into by the Authority "for the doing of any work," but excepted from the bidding requirement contracts "for the furnishing or performing [of] services of a professional nature." *L.* 1971, *c.* 137, § 21, *repealed by L.* 1981, *c.* 447, § 7, eff. Jan. 9, 1982.

The *Autotote* Court held that the "professional services" exemption to the NJSEAL public bidding requirement applied because "the services to be provided under the . . . contract called for such

a degree of technical knowledge and professional skill as to bring the contract within the 'professional services' exception to the bidding requirement." *Autotote, supra,* 85 *N.J.* at 373, 427 *A.*2d 55. The *Autotote* Court did not have before it, however, the sort of hybrid property-services contract that we are considering in this appeal, and its conclusion that the contract was one for "professional services" does not inform our determination whether the Mercer and Morris agreements should be regarded, for purposes of the LPCL, as contracts for "real property or any interest therein." *N.J.S.A.* 40A:11–2(4).

Defendants also make much of our statement in *McGuire v. City of Jersey City,* 125 *N.J.* 310, 593 *A.*2d 309 (1991), that the LPCL "has no application to acquisitions of interests in real property." *Id.* at 318, 593 *A.*2d 309. *McGuire* is clearly distinguishable. That case involved a lease entered into by an individual for twenty years for the use of two buildings owned by the City of Jersey City, and one of the questions reviewed by the Court was whether the lease was invalid pursuant to an LPCL provision that mandated annual cancellation clauses for multi-year leases and contracts. *N.J.S.A.* 40A:11–15. The Court held that the LPCL did not regulate the Jersey City lease because the lease qualified for the LPCL real property exception. *McGuire, supra,* 125 *N.J.* at 318, 593 *A.*2d 309. The lease in *McGuire* bore no resemblance, however, to the Mercer and Morris agreements-it was a traditional lease for property and was not accompanied by the vast array of service obligations, payments based on service performance, and requirements for the devotion of additional property that the agreements in this appeal contain.

Finally, Mercer and Waste Management argue that because Mercer planned to build a resource recovery facility when the Mercer agreement was signed, Mercer was exempted from the LPCL public bidding requirement pursuant to the SWMA, as amended in 1985 by the McEnroe Act. *L.* 1985, *c.* 38. As amended, the SWMA provides in relevant part:

The provisions of any other law, rule or regulation to the contrary notwithstanding, and as an alternative to any other procedure provided for by law or by order of the Board of Public Utilities, a contracting unit may enter into a contract with a vendor for the design, financing, construction, operation or maintenance, or any combination thereof, of a resource recovery facility, or for the provision of resource recovery services, pursuant to the provisions of this amendatory and supplementary act.

[*N.J.S.A.* 13:1E–153 (footnotes omitted).]

The Act allows such contracts to be awarded for a period of forty years, *ibid.*, and sets forth a series of bidding procedures that are, in certain respects, different from the requirements set forth in the LPCL. *N.J.S.A.* 13:1E–154 to 163.

The Mercer agreement clearly does not qualify for the McEnroe Act procurement process. Mercer and Waste Management argue, essentially, that their 1988 agreement, which is exclusively an agreement for solid waste *disposal*, should be incorporated into the McEnroe Act exemption for resource-recovery services because Mercer had *contemplated* entering into a contract to construct a resource recovery facility that would have fallen squarely within the *N.J.S.A.* 13:1E–153 language, and the Mercer / Waste Management agreement would have supplemented that resource recovery contract. As noted, however, although Mercer intended in its 1979 solid waste management plan to build a resource recovery facility that might have qualified for the *N.J.S.A.* 13:1E–153 exemption, the county never built one. As such, the Mercer agreement involves no obligation on the part of either party to "design, financ[e], construct[ ], operat[e] or maint[ain] ... a resource recovery facility" or to provide "resource recovery services." *N.J.S.A.* 13:1E–153.

## V

Waste Management raises two constitutional challenges to the Appellate Division's disposition First, Waste Management argues that the Appellate Division holding violated its constitutional rights by ruling that the Mercer and Morris agreements did not create valid easements. However, we do not construe the Appellate Division opinion as invalidating the easements, and we ex-

pressly decline to address the validity of the purported easement grants in this opinion. The Appellate Division held, and we affirm, that the Mercer and Morris agreements, whether they grant *bona fide* property rights or not, are subject to the public bidding requirements of the LPCL. Waste Management's first constitutional challenge is, therefore, moot.

■ Waste Management also argues that the Appellate Division's decision to invalidate the Mercer and Morris agreements at this late juncture violates the Contract Clause of the United States Constitution, *U.S. Const.*, Art. I, Sec. 10, Cl. 1 ("No State shall ... pass any ... Law impairing the Obligation of Contracts ...."), because it constitutes an "arbitrary" impairment of Waste Management's long-standing contractual relationships. As we have discussed, however, *supra* at 152–58, 777 *A.2d* at 28–32, the Appellate Division's determination to hear the LPCL claims was not arbitrary, and we perceive no constitutional impediments to its holding or ours. The justifications for reaching the LPCL issues are substantial, and the adjustment of "the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying" our disposition. *United States Trust Co. v. New Jersey*, 431 *U.S.* 1, 22, 97 *S.Ct.* 1505, 1518, 52 *L.Ed.2d* 92, 109–10 (1977).

VI

■ We now consider the question of remedy. Defendants urge us to apply our holding prospectively. They remind us of plaintiffs' delay in bringing their complaints, and emphasize that, while not in compliance with the LPCL, neither of the processes undertaken by the counties prior to awarding their contracts to Waste Management indicated any hint of corruption or favoritism. With respect to the delay, we note again that although the delay was significant, the prospect of prejudice to the public, combined with the duration of the Mercer and Morris agreements, lead us to conclude that these contracts must be re-bid. Concerning the

absence of apparent corruption or favoritism in the procurement of the two agreements, we are convinced that those considerations do not provide a justification for overlooking violations of the public bidding laws. As this Court noted in *Hillside, supra,* 25 *N.J.* at 326, 136 *A.*2d 265, in enforcing public bidding laws "it is better to leave the door tightly closed than to permit it to be ajar, thus necessitating forevermore in such cases speculation as to whether or not it was purposely left that way." *See also Terminal Constr. Corp. v. Atlantic City Sewerage Auth.,* 67 *N.J.* 403, 409, 341 *A.*2d 327 (1975) (noting that public bidding is required "even though it is evident that in fact there was no corruption or any actual adverse effect upon the bidding process.").

Defendants suggest that prospective application is demanded by our disposition in *National Waste, supra,* 150 *N.J.* at 231–32, 695 *A.*2d 1381, where we determined to leave in place a contract that was not bid pursuant to the LPCL. The contract in *National Waste,* however, had less than three years remaining until its completion at the time the Court's opinion was filed, and the Court found that the bidding process undertaken in that case "result[ed] in substantial savings to the County." *Id.* at 231, 695 *A.*2d 1381. Here, the Mercer and Morris agreements are not scheduled to expire until 2007 and 2008, respectively, and, as noted, the record before us is far from clear on whether the agreements have resulted in savings or above-market costs to the public. This is not, in other words, one of the "unique instance[s]," *id.* at 232, 695 *A.*2d 1381, where prospective application in the context of a public bidding violation would be appropriate.

We therefore affirm the judgment of the Appellate Division and remand these cases to the Law Division with instructions to set appropriate deadlines for re-bidding of the Mercer and Morris solid waste disposal contracts. The Law Division should take into consideration the time that will be required for the counties to prepare bid specifications, and other factors that the interests of equity demand. The court should not, however, delay any longer than is necessary to ensure a smooth transition between the

current and subsequent contracts. The Mercer and Morris agreements with Waste Management shall remain in force until the bidding process is complete and the new contracts are implemented.

*For affirmance and remandment*—Justices STEIN, COLEMAN, LONG, VERNIERO and ZAZZALI—5.

*Opposed*—None.