877 A.2d 363

CLEAN EARTH DREDGING TECHNOLOGIES, INC., A PENNSYL-VANIA CORPORATION, AND RESOURCES WAREHOUSING CONSOLIDATION SERVICES, INC., A NEW JERSEY CORPO-RATION, PLAINTIFFS–APPELLANTS, v. HUDSON COUNTY IMPROVEMENT AUTHORITY, A BODY CORPORATE AND POLITIC OF THE STATE OF NEW JERSEY; AND GREAT LAKES DREDGE AND DOCK COMPANY, A DELAWARE COR-PORATION, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued June 2, 2005—Decided July 21, 2005.

Before Judges WEFING, PAYNE and C.S. FISHER.

*Thomas S. Cosma* argued the cause for appellants (*Connell Foley,* attorneys; *Kevin J. Coakley,* of counsel; *Mr. Cosma,* of counsel and on the brief).

*Benjamin Clarke* argued the cause for respondent Hudson County Improvement Authority (*DeCotiis, FitzPatrick, Cole & Wisler,* attorneys; *David A. Clark,* on the brief).

*Sandra T. Ayres* argued the cause for respondent Great Lakes Dredge and Dock Company (*Scarinci & Hollenbeck,* attorneys; *Ms. Ayres,* of counsel and on the brief).

The opinion of the court was delivered by

WEFING, P.J.A.D.

Plaintiffs Clean Earth Dredging Technologies, Inc. and Resources Warehousing Consolidation Services, Inc. appeal from trial court orders denying their request for a preliminary injunction and granting summary judgment to defendants Hudson County Improvement Authority and Great Lakes Dredge and Dock Company. After reviewing the record in light of the contentions advanced on appeal, we affirm.

The dispute between the parties revolves around one portion of an approximately one-hundred-seventy-five-acre parcel of land in Kearny owned by defendant Improvement Authority, which is referred to generally as the Koppers Seaboard Site. Efforts have been underway to remediate this land since the closing of the

Koppers Seaboard Coke plant, whose operations left the property significantly contaminated. In 1986, the New Jersey Department of Environmental Protection and Beazer East, the successor to Koppers, entered into an Administrative Consent Order for such remediation. For reasons that are not contained in the record before us, the terms of that Administrative Consent Order were not complied with, and the Improvement Authority purchased the site to continue the remediation process.

The property abuts the Hackensack River and includes a deep-water dock. The Improvement Authority began to explore the possibility of leasing a portion of the tract, including the docking facility, to a dredge processing company, with the idea that this would achieve two objectives: provide an income stream from the rental payments and provide a source of processed dredge material that could be used in the remediation efforts.

In December 2003, the Improvement Authority published its initial Request for Expressions of Interest in which it solicited proposals to lease an area of five to ten acres to be used for dredge materials management. In this original Request, the Improvement Authority included the following statement.

> The [Improvement Authority] may choose to purchase up to 200,000 cubic yards of processed dredge materials from the selected Proposer for use at the Site. As an option, the Proposer shall provide its price per cubic yard for supplying, placing and compacting processed dredge materials at locations on the site, directed by [the Improvement Authority].

According to this Request, the Improvement Authority expected, as a financial consideration, "a payment, paid in monthly installments, for the area leased to the Proposer. In addition, the [Improvement Authority] would receive a royalty fee in dollars per cubic yard, paid in monthly installments, for the processed dredge materials received or processed by the Proposer at the Leased Area."

The Improvement Authority then conducted a meeting with interested parties, at which it learned that its Request had not been drafted to reflect the manner in which dredging companies conducted their operations. Specifically, their dredging opera-

tions left them with materials to be deposited elsewhere and the companies, rather than selling that dredged material, would pay others to accept it. The Improvement Authority then realized that rather than a transaction which would produce two income streams and one accompanying expenditure, the transaction could be structured to provide it with three sources of income: monthly rental payments for use of the particular portion of the site, monthly royalty payments based upon the quantity of dredged material processed at the site, and payment for its acceptance of processed dredge materials. The Improvement Authority revised its Request to reflect this economic framework.

Ultimately, the Improvement Authority received proposals from four companies, including plaintiff Clean Earth and defendant Great Lakes. One was rejected as non-responsive, and the Improvement Authority then set up meetings with representatives of the remaining ones, inviting each to submit its best offer. At the conclusion of these meetings, the Improvement Authority decided to enter into final negotiations with defendant Great Lakes. The Improvement Authority and Great Lakes executed a lease in June 2004.

Clean Earth then commenced this action, complaining that the terms of the lease between the Improvement Authority and Great Lakes differed materially from the terms set forth in the Improvement Authority's several Requests and was thus a violation of the Local Lands and Buildings Law, *N.J.S.A.* 40A:12–1 to –30, and the principles of competitive bidding.

The changes pointed out by Clean Earth can be summarized as follows. The revised Request the Improvement Authority issued on January 6, 2004, increased the Authority's option to buy 200,000 cubic yards of processed dredge materials from a maximum to a minimum, granted the Authority a minimum monthly royalty based on receipt of 50,000 cubic yards of processed dredge material, increased the area to be leased from five to ten acres to up to twenty acres, including rights to use the northerly dock, required processed dredge materials be removed from the site

within forty-eight hours, changed the term of the lease from five years to three years with two optional one-year extensions, and required the operations to begin within three to six months of contract execution. After Great Lakes asked for an extension of the deadline within which time to respond to the request, the Improvement Authority again revised the Request, extended the deadline from January 21 to February 4, and increased the amount of time afforded the lessor to remove the processed dredge material from forty-eight to ninety-six hours.

The lease executed by the Improvement Authority and Great Lakes differed from the final Request in that the Improvement Authority agreed to accept a minimum of 400,000 cubic yards of processed dredge material instead of a minimum of 200,000. The lease also required Great Lakes to pay a base rent of $198,000 per year, instead of the $120,000 Great Lakes had proposed to pay, and replaced the $6.75 per cubic yard royalty Great Lakes had proposed to pay to place processed dredge material on the Koppers Seaboard site with a staggered placement fee based on the amount of processed dredge material Great Lakes processed and placed at the site.[1] The lease incorporated Great Lakes' proposed royalty of $1 per cubic yard of dredge material processed at the leasehold site but transported off-site.

Clean Earth was joined in the action by plaintiff Resources Warehousing, a corporation located in North Bergen and a Hudson County taxpayer. The trial court entered an order to show cause, without temporary restraints. Defendants then promptly moved for summary judgment. After briefing and oral argument, the trial court granted those motions. This appeal followed.

Plaintiffs make three arguments on appeal: 1) that the contract was subject to the competitive bidding requirements of the Local

---

[1] The placement fee royalty in the lease is $7.75 per cubic yard for the first 200,000 cubic yards of processed dredge material placed at the Koppers Site; $8.75 per cubic yard on the second 200,000 cubic yards; and $9.50 per cubic yard on any amount above the 400,000 cubic yards.

Public Contracts Law, 2) that the Improvement Authority could not award a contract to Great Lakes on materially different terms than it had advertised in its Requests, and 3) that the lease was subject to the Local Lands and Buildings Law.

# I

Before proceeding to analyze these claims in detail, we set forth certain established principles. "New Jersey has a long tradition of requiring open and free competitive bidding for public contracts." *Borough of Princeton v. Mercer County,* 333 *N.J.Super.* 310, 328, 755 *A.2d* 637 (App.Div.2000) (citing *Terminal Const. Corp. v. Atlantic County Sewerage Auth.,* 67 *N.J.* 403, 341 *A.2d* 327 (1975); *Twp. of Hillside v. Sternin,* 25 *N.J.* 317, 136 *A.2d* 265 (1957)), *aff'd* 169 *N.J.* 135, 777 *A.2d* 19 (2001). To that end, the Legislature has enacted a comprehensive statutory framework governing public contracts. These statutes "exist for the benefit of taxpayers, not bidders, and should be construed with sole reference to the public good." *Nat'l Waste Recycling, Inc. v. Middlesex County Improvement Auth.,* 150 *N.J.* 209, 220, 695 *A.2d* 1381 (1997).

> A major objective of all public bidding statutes has been to promote the honesty and integrity of those bidding and of the system itself.
>
> "Bidding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good. Their objects are to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of unfettered competition. To achieve these purposes, all bidding practices which are capable of being used to further corrupt ends or which are likely to affect adversely the bidding process are prohibited, and all awards made or contracts entered into where any such practice may have played a part, will be set aside. This is so even though it is evident that in fact there was no corruption or any actual adverse effect upon the bidding process."
> [*Keyes Martin & Co. v. Dir., Div. Of Purchase & Prop.,* 99 *N.J.* 244, 256, 491 *A.2d* 1236 (1985) (quoting *Terminal Const. Corp., supra,* 67 *N.J.* at 409–10, 341 *A.2d* 327).]

Justice Francis, writing for the Supreme Court, said that "the efficacy of our competitive bidding statute depends upon its rigorous enforcement." *Hillside Twp. v. Sternin, supra,* 25 *N.J.* at 327, 136 *A.2d* 265. Our judicial system has not retreated from

that principle in the nearly fifty years that have elapsed since. *See Princeton v. Mercer County, supra,* 169 *N.J.* at 166–67, 777 *A.*2d 19 (holding material defect in bid required waste disposal contract to be rebid); *see N.E.R.I. Corp. v. New Jersey Highway Auth.,* 147 *N.J.* 223, 236, 686 *A.*2d 328 (1996) (requiring Highway Authority to rebid towing contract because award had not been made to lowest bidder); *see Meadowbrook Carting Co. v. Borough of Island Heights,* 138 *N.J.* 307, 320, 650 *A.*2d 748 (1994) (holding bidder's failure to include consent of surety in bid proposal was material defect that borough could not cure); *see L. Pucillo & Sons, Inc. v. Mayor of New Milford,* 73 *N.J.* 349, 358–59, 375 *A.*2d 602 (1977) (holding bidder's failure to include price proposal for five-year contract when municipality required bidders to provide proposals for one-, two-, three-, and five-year contracts was material irregularity that could not be waived).

## II

Not all transactions by a public entity, however, are subject to public bidding requirements. Transactions below the statutory threshold amount (presently $17,500) may be awarded without advertising for public bids. *N.J.S.A.* 40A:11–3. Contracts, the subject matter of which are certain defined matters, such as professional services, or expenses necessary to prepare and conduct an election, are similarly exempt from the public bidding requirement. *N.J.S.A.* 40A:11–5. Clearly this transaction is not saved by either of those statutory provisions.

Defendants, however, point to *N.J.S.A.* 40A:11–2(4) which exempts from the definition of "purchase" a transaction involving "real property or any interest therein." In *McGuire v. City of Jersey City,* 125 *N.J.* 310, 318, 593 *A.*2d 309 (1991), the Supreme Court recognized that statutory exemption, stating "the Local Public Contracts Law governs contracts and leases for goods and services only, and has no application to acquisitions of interests in real property." In *McGuire,* the Court approved of the earlier conclusion of this court that the Legislature did not intend leases

of real property to be governed by the Local Public Contracts Law. *Ibid.* (citing *D'Ercole v. Mayor of Norwood*, 198 *N.J.Super.* 531, 541, 487 *A.*2d 1266 (App.Div.1984)). Defendants stress that the transaction between the Improvement Authority and Great Lakes was a lease and thus exempt from the requirements of the Local Public Contracts Law. Plaintiffs, on the other hand, contend that a significant portion of the transaction involved the procurement of processed dredge material and should be subject to the public bidding requirements of the Local Public Contracts Law.

This court has in the past dealt with the applicability of the Local Public Contracts Law to transactions drafted in terms of interests in real property. It is the substance of the transaction that is determinative, not the terminology employed. *Princeton v. Mercer County, supra,* 169 *N.J.* at 161, 777 *A.*2d 19 (rejecting the contention that contracts purporting to create an easement in certain landfills created an interest in real property and were not subject to public bidding requirements, and noting that "terminology does not … alter the overriding purposes of the agreements").

"[A] lease gives the right of exclusive possession for all purposes not prohibited by its terms." *Thiokol Chem. Corp. v. Morris County Bd. of Taxation,* 41 *N.J.* 405, 417, 197 *A.*2d 176 (1964). In determining whether an agreement is a lease, a court should look to the parties' intent, the circumstances surrounding the transaction and the parties' course of operation. *Ibid.*

## A

We turn now to the subject lease. We agree with the conclusion of the trial court that the dominant structure of the agreement between the Improvement Authority and Great Lakes is the creation of a leasehold interest in a twenty-acre portion of the Koppers Seaboard Site, as opposed to a purchase or procurement of processed dredge material. The Improvement Authority will receive three forms of compensation in return for permitting Great Lakes to maintain and operate a processed dredge facility

upon its land: it will receive an annual rent of $198,000 a year; it will receive a royalty of $1.00 per cubic yard for the processed dredge material unloaded at the site, processed and then shipped to other locations; and it will receive a placement fee, computed on a sliding scale, for the processed dredge material Great Lakes deposits on the Koppers site in accordance with the Authority's directives.

Both the structure of the document, which places the provisions for payment of the deposit fee within the lease clause defining the rental obligation, and, more importantly, the nature of the transaction itself, convince us that it would be impossible to separate out the placement of the processed dredge material on the land requiring remediation from the lease of the land intended to be used as a process dredge facility. In our judgment, the "defining quality of the agreement[ ] involves the creation of property interests," *Princeton v. Mercer County, supra,* 169 *N.J.* at 161, 777 *A.*2d 19, and not the purchase of processed dredged material.

*N.J.S.A.* 40A:11–4 provides that "[e]very contract . . . for the provision or performance of any goods or services, the cost of which in the aggregate exceeds the bid threshold, shall be awarded only . . . to the lowest responsible bidder after public advertising for bids." The concept of the "lowest responsible bidder" is anomalous in the present transaction; the Improvement Authority is not purchasing processed dredge material to use; it is being compensated for permitting processed dredge material to be deposited on its lands. The Improvement Authority is not expending public funds, in which instance, the lowest responsible bidder should be selected as the vendor or supplier. Rather the Improvement Authority is receiving money in exchange for permitting the use of its land and is looking for the highest responsible payor.

We agree with the conclusion of the trial court that the subject transaction is a lease and, as a result, is exempt from the public bidding requirements of the Local Public Contracts Law.

## B

This conclusion, that the transaction is not subject to the Local Public Contracts Law, dooms plaintiffs' second contention, that the Improvement Authority's lease with Great Lakes should be set aside because its terms are materially different than what the Improvement Authority set forth in its Requests. The case law upon which plaintiffs rely all involve contracts subject to the Local Public Contracts Law and is thus inapplicable to the questions before us.

We note, moreover, that the Request stated from the outset that the party selected by the Improvement Authority would have to sign a contract with the Improvement Authority and that the contract terms "would be negotiated by the [Improvement Authority] with the selected Proposer." That modifications and adjustments were a real possibility was recognized by all the participants from the beginning. Great Lakes did not receive an unfair advantage in this regard.

## III

Plaintiffs also contend that even if the transaction is, indeed, a lease, it still was subject to our public bidding laws under the Local Lands and Building Law, *N.J.S.A.* 40A:12–1 to –30. This statute, unlike the Local Public Contracts Law, contains no exemption for transactions involving interests in real property.

We are satisfied, however, as was the trial court, that the Improvement Authority is not subject to the Local Lands and Building Law. *N.J.S.A.* 40A:12–14 details the bidding requirements for the leasing of real property; that statute only applies, however, to counties and municipalities. It does not apply to a public body such as defendant Improvement Authority.

The Improvement Authority was created pursuant to *N.J.S.A.* 40:37A–44 to –135. It is a "public body politic and corporate constituting a political subdivision of the State." *N.J.S.A.* 40:37A–55. The Legislature, moreover, specifically included within the

statute authorizing the creation of an improvement authority the directive that such an authority "shall not constitute or be deemed to be a county or municipality ... for the purposes of any other law." *N.J.S.A.* 40:37A–90.

> The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language. We ascribe to the statutory words their ordinary meaning and significance and read them in context with related provisions so as to give sense to the legislation as a whole. It is not the function of this Court to rewrite a plainly-written enactment of the Legislature or presume that the Legislature intended something other than that expressed by way of the plain language.
>
> [*DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 A.2d 1039 (2005) (internal citations omitted).]

We consider it clear that the Legislature has made a conscious choice to exempt improvement authorities from the terms of the Local Lands and Buildings Law. We are not authorized to second-guess or ignore that choice.

In light of our conclusions that the transaction is subject to neither the Local Public Contracts Law nor the Local Lands and Building Law, we do not consider it necessary to consider the defendants' contention that plaintiff Clean Earth is estopped from challenging this lease award in light of its full participation in the process that it now characterizes as illegal and void. *See Autotote Ltd. v. New Jersey Sports and Exposition Auth.,* 85 *N.J.* 363, 369, 427 *A.*2d 55 (1981) (holding "a party is estopped from challenging the award of a contract which it actively sought through the same procedures it now attacks").

The order under review is affirmed.