NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1833-15T4

MASTEC RENEWABLES
CONSTRUCTION COMPANY,
INC.,

       Plaintiff-Appellant,

v.

SUNLIGHT GENERAL MERCER
SOLAR, LLC,

       Defendant,

and

MERCER COUNTY IMPROVEMENT
AUTHORITY,

       Defendant-Respondent.

_____

**APPROVED FOR PUBLICATION**

**February 6, 2020**

**APPELLATE DIVISION**

Argued December 5, 2018 – Decided February 6, 2020

Before Judges Fuentes, Accurso and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-0336-14.

Louis Anthony Modugno argued the cause for appellant (Mc Elroy Deutsch Mulvaney & Carpenter, LLP, attorneys; Richard J. Williams, Louis Anthony Modugno, Eric James Hughes, and Greg Trif, of counsel and on the briefs).

William Harla argued the cause for respondent (De Cotiis FitzPatrick Cole & Giblin LLP, attorneys; William Harla and Thomas A. Abbate, of counsel; Alice M. Bergen, of counsel and on the briefs).

Florio Perrucci Steinhardt & Cappelli, LLC, attorneys for amicus curiae Utility & Transportation Contractors Association of New Jersey, Inc. (Adrienne L. Isacoff, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

SunLight General Mercer Solar, LLC (SunLight) was the general contractor of a project to construct a renewable solar generating facility (SGF) on the campus of the Mercer County Community College (College). SunLight hired MasTec Renewables Construction Company, Inc. (MasTec) as the subcontractor to design and construct the SGF. The Mercer County Improvement Authority (MCIA) issued bonds in excess of $29,000,000 to fund the project. SunLight, as the designated owner of the SGF, entered into a power purchase agreement with the College through which it sold renewable energy at a fixed price during the term of its lease agreement with the MCIA.

MasTec completed the project and alleged it was owed in excess of $10,000,000 from Sunlight. When it was unable to resolve this dispute with Sunlight, MasTec filed a mechanics' lien notice against the MCIA in the amount $10,250,500. Counsel for the MCIA responded in January 2014 and

informed MasTec that its mechanic's lien was not valid because the County Improvement Authorities Law (CIAL), N.J.S.A. 40:37A-44 to -135, specifically exempts the property of a county improvement authority from "judicial process."  MasTec settled its claims against Sunlight and agreed to reduce its lien claim to $6,900,000.  Thereafter, MasTec filed a complaint against the MCIA to foreclose on its mechanic's lien to recover the payment owed by Sunlight.  The Law Division granted the MCIA's motion to dismiss MasTec's foreclosure complaint under Rule 4:6-2(e).  The trial court held that pursuant to N.J.S.A. 40:37A-127, all of MCIA's property is exempt from judicial process.

In this appeal, MasTec argues its municipal mechanic's lien is enforceable against the MCIA's SGF project fund pursuant to the Municipal Mechanics' Lien Law (MMLL), N.J.S.A. 2A:44-125 to -142.  Amicus curiae Utility and Transportation Contractors Association of New Jersey, Inc. (UTCA) supports MasTec's legal position.  MasTec and amicus UTCA seek that this court declare that a subcontractor on a municipal construction project can enforce and foreclose on a municipal mechanics' lien against the project fund held by a county improvement authority.  The MCIA urges us to reject this argument and hold that monies in that fund are exempt from judicial process.

In our view, the resolution of this appeal does not lie on MasTec's ability to foreclose on a municipal mechanics' lien. The threshold question is whether MasTec has the right to file a valid lien in the first place.

The CIAL defines a county improvement authority as "a public body politic and corporate constituting a political subdivision of the State[.]" N.J.S.A. 40:37A-55. Furthermore, "an authority shall not constitute or be deemed to be a county or municipality or agency or component of a municipality for the purposes of any other law[.]" N.J.S.A. 40:37A-90. Liens under the MMLL attach only to the funds held by a "public agency," which the MMLL defines as "any county, city, town, township, public commission, public board or other municipality[.]" N.J.S.A. 2A:44-126 -128. The MMLL does not apply to county improvement authorities. In this light, we hold that the lien notice MasTec filed against the MCIA is not valid. We thus affirm the order dismissing the foreclosure complaint as a matter of law under Rule 4:6-2(e) for reasons other than those expressed by the trial court. See Hayes v. Delamotte, 231 N.J. 373, 387 (2018).

I

In May 2011, the MCIA issued a request for proposals (RFP) for the development, design, and construction of an SGF on the grounds of the College. In response to the RFP, SunLight and Mastec submitted a joint

proposal. SunLight was "the lead entity" responsible for financing, future operations, and maintenance. MasTec was "the subcontractor" responsible for all upfront design and construction work. The MCIA accepted this proposal.

To finance the project, the MCIA agreed to pay SunLight seventy percent of the fixed costs by issuing federally taxable, county-guaranteed municipal Series 2011A Local Bonds (Bonds) in the amount of $29,550,000. These "Public Project Funds" were deposited into a separate account administered by a designated trustee. SunLight agreed to finance the remaining thirty percent of the project's fixed costs by providing an equity contribution of the funds it received from a federal cash grant for solar developers and contractors (the 1603 Grant Funds).[1]

Despite the role of the independent trustee, MasTec alleged in its foreclosure complaint that the MCIA "exercised control over the Public Project Funds at all times." On December 1, 2011, the MCIA and the trustee signed an "Indenture of Trust . . . Securing $29,550,000 COUNTY OF MERCER GUARANTEED RENEWABLE ENERGY PROGRAM LEASE REVENUE NOTES AND BONDS, SERIES 2011A AND ADDITIONAL BONDS OF THE MERCER COUNTY IMPROVEMENT AUTHORITY." Article V of that

---

[1] Section 1603 of the American Recovery and Reinvestment Tax Act of 2009, 26 U.S.C. § 48, directed the United States Treasury Department to provide grants for certain energy property in lieu of tax credits.

indenture created: (1) the Project Fund consisting of a bonds' proceeds account, an account for SunLight's thirty-percent equity contribution and a restoration security account; (2) the Administrative Fund; (3) the Revenue Fund consisting of the lease payments from SunLight; (4) the Debt Service Fund consisting of an interest account, a principal account, and a capitalized interest account; (5) the County Security Fund encompassing the initial $3,000,000 from the 1603 Grant Funds to secure payment of the debt service on the bonds; and (6) the General Fund.

The trustee was directed to pay the costs of the project from the Project Fund in accordance with a separate lease purchase agreement between the MCIA, SunLight, and the College. Article V also stated:

> Each of the Funds and Accounts created by this Indenture, other than the Administrative Expense Account and the Costs of Issuance Account within the Administrative Fund [and] the Restoration Security Account within the Project Fund . . . , is hereby pledged to, and charged with, the payment of the principal or Redemption Price, if any, of the interest on the Bonds as the same shall become due.

Article VIII, Section 8.03, entitled, "Liens, Encumbrances and Charges," stated in part: "The Authority shall not create or cause to be created and shall not suffer to exist any lien, encumbrance or charge upon the Trust Estate, except the pledge, lien and charge created for the security of the Holders of the Bonds." The "Trust Estate" included the lease revenue payments from

SunLight, any monies paid through the Mercer County's guaranty, and the funds and accounts created by the Indenture. The latter did not include the Administrative Expense Account; the Costs of Issuance Account within the Administrative Fund; the Restoration Security Account within the Project Fund; and "any other amounts received from any other source by or on behalf of the [MCIA] and pledged by the [MCIA] . . . as security for the payment of the principal, redemption premium, if any, and interest on the Bonds."

The MCIA thereafter executed three agreements with SunLight and the College dated December 1, 2011: (1) a site license agreement; (2) a lease purchase agreement; and (3) a power purchase agreement. MasTec was not a party to any of these agreements. The site license agreement permitted SunLight to access the College's property to, among other things, construct, operate, and maintain the SGF.

Under the lease purchase agreement, the MCIA was responsible to fund the majority of the costs. SunLight was obligated to construct the project, pay the initial $3,000,000 of its 1603 Grant Funds into the County Security Fund, and provide the procedure for the MCIA to release payments for project costs. To receive payments from the Project Fund, SunLight was required to submit "Draw Papers" to the Trustee that were acknowledged by the College and acknowledged, as to form only, by the MCIA. The MCIA limited its financing

to the net amounts received from the issuance of the bonds and expressly assumed no liability for cost overruns or excess project costs.

The lease purchase agreement: (1) conveyed to SunLight a leasehold interest in the SGF; (2) obligated SunLight to make periodic lease payments in amounts sufficient for the MCIA to pay the costs, expenses, and debt service on the Series 2011A Bond; and (3) granted SunLight an option to purchase the leased property at the end of a fifteen-year term specified in the power purchase agreement. The lease also required SunLight to remove or discharge "any materialman's, mechanics' or construction lien . . . filed against the Project or any part thereof." The power purchase agreement required SunLight to sell all of the generated renewable energy to the College at a specified fixed price during the leasehold. This agreement defined MasTec as the "EPC [Engineering, Procurement, and Construction] Contractor, a Florida Corporation and an affiliate of PPM LLC."

On December 21, 2011, SunLight, the designated "Owner," and MasTec, the designated "Turnkey Contractor," executed a Turnkey Design, Engineering, Procurement, and Construction Contract (the EPC Contract). Section 20.6 of the EPC Contract expressly provided that the Turnkey Contractor

> is an independent contractor. Nothing contained in
> this Agreement, nor the act of the Parties in submitting

a joint Proposal in response to the RFP, nor any act of a Party in pursuing its rights or fulfilling its obligations under this Agreement, will be construed as creating a partnership or joint venture relationship between the Parties, nor shall it be construed as creating any relationship whatsoever between Owner and Turnkey Contractor's employees.

In the EPC Contract, MasTec agreed, for a fixed and non-negotiable fee, to assume and perform SunLight's obligations for designing, permitting, supplying, constructing, installing, and testing the SGF. MasTec alleged: (1) the original base price of the EPC Contract was $30,062,500; (2) the price would be adjusted if the kilowatt capacity increased by a certain percentage, if the layout or design changed, or if there was a material change to the site; and (3) SunLight and the MCIA agreed that the 1603 Grant Funds associated with the project would be used to pay MasTec for the costs of construction. If MasTec disputed the payments from SunLight, it could "initiate a [d]ispute proceeding," which involved good faith negotiations and then arbitration, and SunLight would have five business days to pay any amount found due and owing, plus interest.

II

Article 16 of the EPC Contract is denoted "Titles; Liens." In lieu of quoting at length each of the six carefully drafted subsections, we note that subsection 16.5 and 16.6 state, in relevant part that: (1) "Turnkey Contractor

shall in no event assert a Lien on the property of the [College] arising out of or in connection with the Work"; and (2) "Unless Owner fails to make payment . . . , Turnkey Contractor shall not directly . . . assert or suffer to exist any Lien on the SGF, or any part of it, or the Owner's licensed estate."

MasTec alleged that the project was plagued by cost overruns; change orders; and extensive delays caused by SunLight, the MCIA, and Superstorm Sandy. These factors significantly increased the project's costs. Notwithstanding these hurdles, MasTec claimed it completed major construction on the SGF and submitted its bills and payment applications to SunLight for $10,250,500 plus $2,650,817.92 for the additional work. SunLight refused to pay.[2] Consequently, pursuant to the EPC Contract, MasTec filed a demand for arbitration to adjudicate its dispute with SunLight.

MasTec also filed a municipal mechanics' lien notice with the MCIA for $10,250,500, an amount that MasTec alleged was greater than the balance of the Public Project Fund at that time, excluding the 1603 Grant Funds. In paragraph fifty-two of its verified complaint filed in the Law Division, MasTec averred that its "Municipal Mechanic's Lien was filed both before the entire work was performed and the project was completed by Sunlight and before the

_____

[2]  In its appellate brief, the MCIA asserts that major construction was completed by October 1, 2013, and that the project is presently operational.

project was accepted by resolution of the Authority, or within the 60 days thereafter, in accordance with N.J.S.A. 2A:44-132."

SunLight settled its dispute with MasTec. In a comprehensive settlement agreement, SunLight agreed to: (1) adjust the EPC Contract's price to $29,625,817; (2) wire MasTec an initial cash payment of $4,302,575; (3) escrow the remaining $2,100,000 of the 1603 Grant Funds "solely in recognition of the fact that the MCIA has asserted . . . that it [was] owed some amount of 1603 Grant Funds;" and (4) apply to the U.S. Treasury for more funding estimated to be approximately $750,000 based on the adjusted contract price. SunLight also agreed not to contest the validity of MasTec's lien, agreed to submit draw papers to the Trustee requesting the release of $6,900,000 to be paid to MasTec from the Project Fund, and stipulated that nothing in the settlement agreement could be construed as an admission of fact or law as to any issue.[3]

## III

MasTec argues that the trial court erred when it dismissed its complaint to foreclose on a municipal mechanics' lien for failure to state a cause of action

---

[3]  In the brief filed in this appeal, the MCIA claims it is not aware of any requisitions by SunLight to the Trustee. It has asserted a default against Sunlight due to its invasion of the 1603 Grant Funds.

upon which relief can be granted. We disagree, albeit, for reasons other than those expressed by the Law Division.

Under Rule 4:6-2(e), a motion to dismiss for failure to state a claim must be denied if, giving plaintiff the benefit of all the allegations asserted in the pleadings and all favorable inferences, a claim has been established. "At this preliminary stage of the litigation the court is not concerned with the ability of plaintiffs to prove the allegation contained in the complaint." Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989).

"[T]he test for determining the adequacy of a pleading [is] whether a cause of action is 'suggested' by the facts." Ibid. (quoting Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 192 (1988)). "[A] reviewing court 'searches the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary.'" Ibid. (quoting Di Cristofaro v. Laurel Grove Mem'l Park, 43 N.J. Super. 244, 252 (App. Div. 1957)). "When a motion challenging the legal sufficiency of a complaint is filed, plaintiff is entitled to a liberal interpretation and given the benefit of all favorable inferences that reasonably may be drawn." N.J. Dep't of Treasury, Div. of Inv. ex rel. McCormack v. Qwest Commc'ns Int'l, Inc., 387 N.J. Super. 469, 478 (App. Div. 2006). Under that standard, motions to dismiss "should

be granted in only the rarest of instances."  Printing Mart-Morristown, 116 N.J. at 772.

We review a dismissal for failure to state a claim pursuant to Rule 4:6-2(e) de novo, following the same standard as the trial court.  Castello v. Wohler, 446 N.J. Super. 1, 14 (App. Div. 2016).  In this context, we accept as true the complaint's factual assertions.  Banco Popular N. Am. v. Gandi, 184 N.J. 161, 165-66, 183-84 (2005).  "The court may not consider anything other than whether the complaint states a cognizable cause of action."  Rieder v. State Dep't of Transp., 221 N.J. Super. 547, 552 (App. Div. 1987).  "It is the existence of the fundament of a cause of action in those documents that is pivotal; the ability of the plaintiff to prove its allegations is not at issue."  Banco Popular N. Am., 184 N.J. at 183.

## Municipal Mechanics' Lien Law

The MMLL, the Public Works Bond Act (Bond Act), N.J.S.A. 2A:44-143 to  -147, and the New Jersey Trust Fund Act (Trust Fund Act), N.J.S.A. 2A:44-148, have historically worked together to protect subcontractors supplying material or labor on municipal construction projects.  Key Agency v. Cont'l Cas. Co., 31 N.J. 98, 104 (1959) (stating the three Acts had an "obvious relationship" and "must be construed together"); see also Unadilla Silo Co. v. Hess Bros., 123 N.J. 268, 277 (1991) (stating MMLL and Bond Act were "to

be construed together" (quoting <u>Morris Cty. Indus. Park v. Thomas Nicol Co.</u>, 35 N.J. 522, 527 (1961))).

The Bond Act, originally enacted in 1918, <u>L.</u> 1918, <u>c.</u> 75, requires contractors on public works construction projects to furnish a bond in an amount equal to or more than the contract price, conditioned on the proper completion of the work, and payable to all subcontractors for any indebtedness that may accrue in an amount not exceeding the sum specified in the bond. N.J.S.A. 2A:44-144. The Trust Fund Act, originally enacted in 1951, <u>L.</u> 1951, <u>c.</u> 344, provides that any money paid by the contracting public entity to the contractor shall constitute trust funds in favor of the unpaid subcontractors. N.J.S.A. 2A:44-148.

The Legislature enacted the present MMLL in 1918. <u>L.</u> 1918, <u>c.</u> 280. The Supreme Court recounted the MMLL's long history in <u>Unadilla</u>, 123 N.J. at 275-76 (citations omitted):

> In 1891 and 1892, the Legislature enacted the antecedents of the present Municipal Mechanics' Lien Law. <u>L.</u> 1891, <u>c.</u> 225, and <u>L.</u> 1892, <u>c.</u> 232. Those statutes specifically provided laborers or materialmen with the right to assert a lien on funds in the municipality's control that had not yet been paid to the contractor. Initially, it was held that the 1892 act did not repeal the right of laborers or materialmen to bring an action against a public body under the general Mechanics' Lien Law. In 1909, however, the Legislature amended the statute, <u>L.</u> 1909, <u>c.</u> 171, § 7, and this Court held [in <u>Key Agency</u>, 31 N.J. at 106,]

14

that that amendment indicated the Legislature's "intention that the act of 1892 should be the sole means for acquiring a mechanics' lien because of any public improvement."

The MMLL gives unpaid subcontractors, materialmen, and laborers having a contractual relationship either with a prime contractor or a subcontractor, a lien "for the value of the labor or materials, or both, upon the moneys due or to grow under the contract and in the control of the public agency." N.J.S.A. 2A:44-128 (emphasis added). The lien acts as security for payment of the services rendered or improvements made with respect to the property. The lien only "attaches to funds appropriated for the payment of such public work and still in the hands of the public agency." Wilson v. Robert A. Stretch, Inc., 44 N.J. Super. 52, 55 (Ch. Div. 1957) (citing Johnson v. Fred L. Emmons, Inc., 115 N.J. Eq. 335, 340 (Ch. 1934), aff'd, 119 N.J. Eq. 88 (E. & A. 1935)).

"'Public agency' means any county, city, town, township, public commission, public board or other municipality in this state authorized by law to make contracts for the making of any public improvement in any city, town, township or other municipality." N.J.S.A. 2A:44-126. Counties are also considered "municipalities" under the MMLL. Herman & Grace v. Bd. of Chosen Freeholders of Essex Cty., 71 N.J. Eq. 541, 547 (Ch. 1906), aff'd o.b., 73 N.J. Eq. 415, 417 (E. & A. 1907). However, the State and its agencies are

not included in the MMLL's definition of "public agency," which is "limited to counties and conventional municipal corporations." Morris Cty. Indus. Park, 35 N.J. at 528 (dictum) (citing Curtis & Hill Gravel & Sand Co. v. State Highway Comm'n, 91 N.J. Eq. 421, 432-33 (Ch. 1920)).

The extent of the MMLL's lien protection is limited to the amount the public agency owes

> to the prime contractor at the time the notice of lien claim is filed or thereafter becoming due. The former cannot be liable for more than the total amount of the prime contract, provided it pays the prime contractor in accordance with the terms thereof and withholds a sum sufficient to cover lien claims filed, and satisfaction of the claim cannot be had out of the public property which is the subject of the project.
>
> [Hiller & Skoglund, Inc. v. Atl. Creosoting Co., 40 N.J. 6, 12-13 (1963).]

The MMLL lien is created by filing a notice with the public agency. N.J.S.A. 2A:44-129; N.J.S.A. 2A:44-132. Upon receipt of the notice, the public agency may require the prime contractor to show cause why the claim should not be paid. N.J.S.A. 2A:44-135. The public agency may deny a lien claim even if no legitimate objection is made. Bd. of Educ. of Bayonne v. Kolman, 111 N.J. Super. 585, 588 (Ch. Div. 1970). Alternatively, the public agency may pay the claim out of the funds in its possession. N.J.S.A. 2A:44-136.

16

If the public agency refuses to pay the MMLL lien, the lien claimant may enforce its rights by commencing an equitable action in the superior court "against the fund," N.J.S.A. 2A:44-137, within a specific time limit, N.J.S.A. 2A:44-138.  See Boardwalk Props., Inc. v. BPHC Acquisition, Inc., 253 N.J. Super. 515, 526 (App. Div. 1991) (finding the Superior Court is a unitary court and "[t]he jurisdiction of the Chancery Division to adjudicate all controversies . . . and render both legal and equitable remedies is co-extensive with that of the Law Division").  "If the public agency is not a corporation, then the county or municipality under which it is constituted shall be made a party defendant." N.J.S.A. 2A:44-139.

The process to enforce a MMLL lien is considered a statutory proceeding in rem, which assumes that the personal liabilities of the prime contractor against the municipality are not the objects of the action. Commonwealth Quarry Co. v. Gougherty, 105 N.J. Eq. 642, 649 (Ch. 1930) During the action, N.J.S.A. 2A:44-140 directs that

> [t]he superior court shall determine the validity and priorities of the liens . . .  and the amount due from the public agency to the contractor under the contract and from the contractor or subcontractor to the respective claimants and shall enter judgment directing the public agency, out of moneys due from it to the contractor, to pay to the several claimants the sums found due to them respectively, with interest and costs upon claims adjudged to be just and valid under this article.

17

In addition, the public agency may "pay into the superior court the amount which it admits to be due [to] the principal contractor upon the contract. The contractor or claimants shall not be precluded thereby from seeking judgment for a further sum." N.J.S.A. 2A:44-141.

Nonetheless, if the claimant neglects to bring an action within the specified time limit, it will be barred from recovering the value of the lien, which will be discharged. N.J.S.A. 2A:44-138; N.J.S.A. 2A:44-142(b). The lien also may be discharged by: (1) a certificate to that effect from the claimant to the financial officer of the public agency, (2) satisfaction of a decree in an action to enforce the lien, or (3) final decree in an action to enforce the lien. N.J.S.A. 2A:44-142.

Notwithstanding a claimant's right to file a MMLL lien, N.J.S.A. 2A:44-127 states that "[n]othing in this article contained shall affect or impair the right of a creditor for labor performed or materials furnished to maintain an action to recover such debt against the person liable therefor." That is, recovery under the MMLL is not the unpaid subcontractor's sole remedy and will not affect or impair recovery against a responsible party.

<u>County Improvement Authorities Law</u>

The Legislature enacted the CIAL in 1960. L. 1960, c. 183. Its purpose was, in part, to allow counties to create a flexible financing vehicle, the county

18                                                              A-1833-15T4

improvement authority, that would serve almost any county purpose. N.J.S.A. 40:37A-47.1. The Legislature stated that every authority created under the CIAL was, among other things, to provide: (1) "public facilities for use by the State, the county or any beneficiary county, or any municipality in any such county, or any two or more or any subdivisions, departments, agencies or instrumentalities of any of the foregoing for any of their respective governmental purposes"; and (2) "the planning, design, acquisition, construction, improvement, renovation, installation, maintenance and operation of facilities or any other type of real or personal property within the county." N.J.S.A. 40:37A-54(a) and (i).

Accordingly, the CIAL makes every county improvement authority "a public body politic and corporate constituting a political subdivision of the State established as an instrumentality exercising public and essential governmental functions to provide for the public convenience, benefit and welfare and shall have perpetual succession and, for the effectuation of its purposes[.]" N.J.S.A. 40:37A-55 (emphasis added). In fact, the MCIA was created by ordinance of the Mercer County Board of Chosen Freeholders "as a public body corporate and politic of the State pursuant to and in accordance with the [CIAL]."

Most noteworthy here, the CIAL grants each improvement authority with independent powers:

(b) To sue and be sued;

(c) To acquire, hold, use and dispose of its facility charges and other revenues and other moneys;

(d) To acquire, rent, hold, use and dispose of other personal property for the purposes of the authority;

. . . .

(f) . . . to lease to any governmental unit or person, all or any part of any public facility for such consideration and for such period or periods of time and upon such other terms and conditions as it may fix and agree upon;

. . . .

(i) . . . to make agreements of any kind with any governmental unit or person for the use or operation of all or any part of any public facility for such consideration and for such period or periods of time and upon such other terms and conditions as it may fix and agree upon;

(j)(1) To borrow money and issue negotiable bonds or notes or other obligations and provide for and secure the payment of any bonds and the rights of the holders thereof, and to purchase, hold and dispose of any bonds;

(2) To issue bonds, notes or other obligations to provide funding to a municipality that finances the purchase and installation of renewable energy systems and energy efficiency improvements by property owners . . . ;

(k) To . . . accept . . . grants of real or personal property, money, material, labor or supplies for the purposes of the authority from any governmental unit or person, and to make and perform agreements and contracts and to do any and all things necessary or useful and convenient in connection with the procuring, acceptance or disposition of such gifts or grants;

. . . .

(o) To acquire, purchase, construct, lease, operate, maintain and undertake any project and to fix and collect facility charges for the use thereof;

(p) To mortgage, pledge or assign or otherwise encumber all or any portion of its revenues and other income, real and personal property, projects and facilities for the purpose of securing its bonds, notes and other obligations or otherwise in furtherance of the purpose of this act;

. . . .

(t) To enter into any and all agreements or contracts, execute any and all instruments, and do and perform any and all acts or things necessary, convenient or desirable for the purposes of the authority . . . subject to the "Local Public Contracts Law[.]"

[N.J.S.A. 40:37A-55(b) to (t).]

"Public facility" means "any lands, structures, franchises, equipment, or other property or facilities acquired, constructed, owned, financed, or leased by the authority or any other governmental unit or person to accomplish any of the purposes of an authority[.]"  N.J.S.A. 40:37A-45(p).  "Real property"

means "lands within or without the State, above or below water, and improvements thereof or thereon, or any riparian or other rights or interests therein[.]" N.J.S.A. 40:37A-45(q).

In furtherance of the Legislature's underlying public policy, the CIAL gives an improvement authority certain tax exemptions. N.J.S.A. 40:37A-85 states that "[a]ll properties of an authority . . . and all public facilities, whether or not owned by the authority . . . shall be exempt from all taxes and special assessments of the State or any subdivision thereof." It also states that

> [a]ll bonds issued pursuant to this act are hereby declared to be issued by a political subdivision of this State and for an essential public and governmental purpose and to be a public instrumentality and such bonds, and the interest thereon and the income therefrom, and all facility charges, funds, revenues and other moneys pledged or available to pay or secure the payment of such bonds, or interest thereon, shall at all times be exempt from taxation except for transfer inheritance and estate taxes.
>
> [Ibid.]

Particularly relevant to our analysis, the CIAL states:

> All property of the authority, except as otherwise provided herein, shall be exempt from levy and sale by virtue of an execution and no execution or other judicial process shall issue against the same nor shall any judgment against the authority be a charge or lien upon its property; provided, that nothing herein shall apply to or limit the rights of the holder of any bonds, bond anticipation notes or other notes or obligations to pursue any remedy for the enforcement of any pledge

or lien given by the authority on its revenues or other moneys; and provided, further, that nothing herein shall limit the authority's ability to enter into partnerships, limited partnerships, joint ventures or other associations as a general partner, limited partner or participant therein.

[N.J.S.A. 40:37A-127 (emphasis added).]

Similarly, the CIAL states:

All property of an authority shall be exempt from levy and sale by virtue of an execution and no execution or other judicial process shall issue against the same nor shall any judgment against an authority be a charge or lien upon its property; provided, that nothing herein contained shall apply to or limit the rights of the holder of any bonds to pursue any remedy for the enforcement of any pledge, mortgage or lien given by an authority on its facility revenues or other moneys, or on its real or personal property.

[N.J.S.A. 40:37A-82 (emphasis added).]

IV

MasTec and amicus UTCA argue the trial court erred when it failed to harmonize the MMLL and the CIAL. Instead, the trial court held that the plain language in N.J.S.A. 40:37A-127 exempts the execution of municipal mechanics' liens against county improvement authorities.[4] MasTec and UTCA

---

[4] The record shows the trial court's decision was substantially influenced by the reasoning in an unpublished opinion from this court. Rule 1:36-3 makes clear that

thus argue that funds purposely appropriated for a public works project under the control of a county improvement authority are private, personal property. As such, these funds are not subject to the judicial process exemption in N.J.S.A. 40:37A-127. Furthermore, because the MMLL liens never attach to the public, real property of any public agency, appellants argue they may impose a lien confined to the amounts owed to the prime contractor or to the subcontractor.

MasTec further asserts that judicial process against a county improvement authority is not per se precluded by the CIAL. According to MasTec, N.J.S.A. 40:37A-55(a) expressly permits authorities to be sued and does not prevent an authority from being named in an in rem proceeding as a necessary party under the MMLL in its capacity as stakeholder and custodian of the Project Fund. Because the public agency does not have a claim to the

> [n]o unpublished opinion shall constitute precedent or be binding upon any court. Except for appellate opinions not approved for publication that have been reported in an authorized administrative law reporter, and except to the extent required by res judicata, collateral estoppel, the single controversy doctrine or any other similar principle of law, no unpublished opinion shall be cited by any court.
>
> [(Emphasis added).]

None of the exemptions codified in the Rule apply here.

Project Fund, MasTec argues it is not personally affected by a mandamus-type judgment directing distribution of those monies. Finally, MasTec argues the holder of a statutory mechanics' lien has a constitutionally protected property interest. Thus, the trial court violated its constitutional rights by construing N.J.S.A. 40:37A-127 to foreclose the means of enforcing its municipal mechanics' lien against the MCIA.

Amicus UTCA maintains that the CIAL is not in conflict with the MMLL's protections that allow liens to be filed against funds owed to contractors. According to the UTCA, the trial court's decision vitiates the MMLL's long history of protecting subcontractors, suppliers, and laborers and discourages them from participating in public works projects. Pursuing this line of reasoning, the UTCA argues that MasTec must be able to foreclose on its lien because the MCIA did not require SunLight to furnish a performance and payment bond. In citing to Picker v. Bayonne, 60 N.J. Super. 251, 257 (App. Div. 1960), UTCA also argues this action by the MCIA removed the safety net for subcontractors afforded by the Bond Act.

The MCIA argues that the plain language in CIAL shows that "all property" is exempt from judicial process and that includes the funds from bondholders held by a Trustee and controlled by a county improvement authority. According to the MCIA, the MMLL does not apply to this

construction project due to the complex financing arrangement between the authority and the joint venture team of MasTec and SunLight. It argues that SunLight is the true owner of the project and MasTec is not a subcontractor. Therefore, the MCIA is merely the financing vehicle for SunLight's lease payments and the bondholders have a first priority lien.

We review matters of statutory interpretation de novo. Verry v. Franklin Fire Dist. No. 1, 230 N.J. 285, 294 (2017). "The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492 (2005). Thus, any analysis to determine legislative intent begins with the statute's plain language. Ibid. "We ascribe to the statutory words their ordinary meaning and significance and read them in context with related provisions so as to give sense to the legislation as a whole." Ibid. (citations omitted). Our authority is bound by clearly defined statutory terms. Febbi v. Bd. of Review, Div. Emp. Sec., 35 N.J. 601, 606 (1961). Where a specific definition is absent, "[w]e must presume that the Legislature intended the words it chose and the plain and ordinary meaning ascribed to those words." Paff v. Galloway Twp., 229 N.J. 340, 353 (2017).

However, this court's review "is not limited to the words in a challenged provision." State v. Twiggs, 233 N.J. 513, 532 (2018). A court "can also draw

inferences based on the statute's overall structure and composition and may consider the entire legislative scheme of which [the statute] is a part." Ibid. (alteration in original) (citations omitted). We do not "view [statutory] words and phrases in isolation but rather in their proper context and in relationship to other parts of [the] statute, so that meaning can be given to the whole of [the] enactment." Ibid. (alterations in original) (quoting State v. Rangel, 213 N.J. 500, 509 (2013)). A court must make every effort to avoid rendering any part of a statute inoperative, superfluous or meaningless. Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 587 (2013).

"'[S]tatutes that deal with the same matter or subject should be read in pari materia and construed together as a unitary and harmonious whole.'" Nw. Bergen Cty. Utils. Auth. v. Donovan, 226 N.J. 432, 444 (2016) (quoting Saint Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 14-15 (2005)). Furthermore, "'[t]he Legislature is presumed to be familiar with its own enactments, with judicial declarations relating to them, and to have passed or preserved cognate laws with the intention that they be construed to serve a useful and consistent purpose.'" Ibid. (alteration in original) (quoting State v. Federanko, 26 N.J. 119, 129-30 (1958)). Thus, unless there are other clues, a court must "presume that the Legislature intended for its two statutory schemes . . . to generally work harmoniously, not in conflict with one another." Ibid. Finally, when a

statute is silent on an issue and both parties have competing interests in how the statute is interpreted, the reviewing court's "task is to fashion protections for both interests, if it can reasonably be done, within the four corners of the statutory scheme." Thomas Grp., Inc. v. Wharton Senior Citizen Hous., Inc., 163 N.J. 507, 518-19 (2000).

N.J.S.A. 40:37A-127 excludes all of the MCIA's property from "execution or other judicial process," except "its revenues or other moneys" in actions brought by "the holder of any bonds, bond anticipation notes or other notes or obligations" to enforce any pledge or lien. This text can be construed to show that subcontractors cannot recover against the MCIA's revenues or other moneys by foreclosure of a municipal mechanics' lien. However, that construction of the statute does not consider the Legislature's intent in the MMLL to protect unpaid subcontractors supplying material or labor on municipal construction projects by enabling them to claim against monies due to the general contractor payable by the public agency.

Our Supreme Court has rejected an approach that elevates form over substance when interpreting statutes. Times of Trenton Pub. Corp. v. Lafayette Yard Cmty. Dev. Corp., 183 N.J. 519, 535-36 (2005). We presume that the Legislature was aware of the MMLL, which was enacted in 1918, when it enacted the CIAL in 1960. Thus, the two statutes should be

considered together. However, when we connect the CIAL with the MMLL, an ambiguity in N.J.S.A. 40:37A-127 is revealed in the phrase "all property." The CIAL is silent on what is covered under the phrase "all property" in N.J.S.A. 40:37A-127. The question therefore becomes whether, in light of the MMLL's legislative intent, "all property" includes the Project Fund created from the MCIA's bond issuance and allocated for the SGF project.

"When the statutory language is ambiguous and 'leads to more than one plausible interpretation,' courts may resort to extrinsic sources, like legislative history and committee reports." Twiggs, 233 N.J. at 532 (quoting DiProspero, 183 N.J. at 492-93). The CIAL's legislative history of its initial enactment and of its subsequent amendments provides no assistance here, as there is no hint that the Legislature ever considered the MMLL in relation to the CIAL or its judicial process exemption.

The resolution lies not in MasTec's attempt to execute or foreclose a municipal mechanics' lien, but in its right, or lack thereof, to file a valid lien in the first place. While mechanics' lien laws may be "liberally construed as to provisions for enforcement," our Supreme Court has instructed that such laws, "being of statutory origin and in derogation of the common law, should be strictly construed with respect to the provisions giving rise to the lien." Morris Cty. Indus. Park, 35 N.J. at 526 (emphasis added). The Court explained:

> This is really saying no more than that where a statute imposes a non-contractual obligation or charge, and one which may result in one party . . . having to satisfy the debt of another party, a court should not extend the substantive benefit thereby given beyond the fair intent and purpose of the legislation, to be discerned primarily from the language of the statute itself and related enactments.
>
> [Ibid.]

Following that direction of strict construction, under the MMLL's N.J.S.A. 2A:44-128(a), a subcontractor on a public improvement project can obtain a lien upon moneys due under the contract and in the control of the "public agency." N.J.S.A. 2A:44-126 defines "public agency" as "any county, city, town, township, public commission, public board or other municipality in this state authorized by law to make contracts for the making of any public improvement in any city, town, township or other municipality." A county improvement agency is not mentioned in that definition.

We agree with the Chancery Division's conclusion that there is "no question" that a municipal housing authority is a "public agency" within the meaning of N.J.S.A. 2A:44-126. Brown Strober Bldg. Supply Corp. v. Fannew Realty, Inc., 174 N.J. Super. 491, 497 (Ch. Div. 1980) (concluding that the MMLL did not apply because subcontractors also asserted liens under the CLL's predecessor). However, N.J.S.A. 40:37A-55 states that, under the CIAL, every county improvement authority is "a public body politic and

30

corporate constituting a political subdivision of the State," and the State and its agencies are excluded from the reach of the MMLL's liens. The Legislature's express intent to exempt county improvement authorities from the terms of the MMLL is found in N.J.S.A. 40:37A-90, which states:

> This act shall be construed liberally to effectuate the legislative intent and as complete and independent authority for the performance of each and every act and thing herein authorized, and an authority shall not constitute or be deemed to be a county or municipality or agency or component of a municipality for the purposes of any other law; provided, however, that no authority, other than an authority created in or performing services for a county of the second class having a population in excess of 265,000, but less than 350,000 inhabitants, in a county of the third class having a population not in excess of 70,000 inhabitants, or in a county of the fifth class having a population in excess of 150,000, but less than 300,000 inhabitants, shall exercise the powers of a common carrier in any such county, and, except as hereinabove in this section set forth, nothing contained in this act shall in any way affect or limit the jurisdiction, rights, powers or duties of any State regulatory agencies.
>
> [(Emphasis added).]

This explicit language, guided by the mandate to construe the CIAL liberally, makes clear that the MCIA cannot constitute or be deemed to be a county or municipality or agency or component of a municipality for the purposes of "any other law," such as the MMLL. The only exception to N.J.S.A. 40:37A-90 can be found in N.J.S.A. 40:37A-55(t), which expressly

makes a county improvement authority's agreements and contracts subject to the Local Public Contracts Law (LPCL).  See Meadowbrook Carting Co. v. Borough of Island Heights, 138 N.J. 307, 313 (1994) (stating the LPCL requires "that municipalities and counties advertise for bids on public contracts that exceed the statutory threshold amount").  Although this exception does not apply here, it shows that the Legislature has made exceptions to N.J.S.A. 40:37A-90, just not one for the MMLL.

N.J.S.A. 40:37A-90 has been cited in a published opinion by this court only once.  In Clean Earth Dredging Techs., Inc. v. Hudson Cty. Improvement Auth., 379 N.J. Super. 261, 263-267 (App. Div. 2005), we were asked to decide whether a lease executed by a county improvement authority was subject to public bidding laws under the Local Lands and Building Law, N.J.S.A. 40A:12-1 to -30.  Relying on the CIAL, we held:

> We are satisfied, however, as was the trial court, that the Improvement Authority is not subject to the Local Lands and Building Law.  N.J.S.A. 40A:12-14 details the bidding requirements for the leasing of real property; that statute only applies, however, to counties and municipalities.  It does not apply to a public body such as defendant Improvement Authority.
>
> . . . The Legislature, moreover, specifically included within the [CIAL] authorizing the creation of an improvement authority the directive that such an authority "shall not constitute or be deemed to be a

county or municipality . . . for the purposes of any other law." N.J.S.A. 40:37A-90.

> . . . .

We consider it clear that the Legislature has made a conscious choice to exempt improvement authorities from the terms of the Local Lands and Buildings Law. We are not authorized to second-guess or ignore that choice.

[Id. at 271-72.]

Following that reasoning, it is clear that "the Legislature has made a conscious choice[,]" id. at 272, to exempt county improvement authorities, like the MCIA, from the terms of the MMLL and its protections. Thus, the lien notice that MasTec filed against the MCIA is not valid. Consequently, MasTec held no constitutionally protected property interest.

Finally, the dire policy implications predicted by amicus UTCA, that subcontractors will be discouraged from supplying material or labor on municipal construction projects are speculative and unlikely. In Friedman v. Stein, 4 N.J. 34, 41 (1950), the Supreme Court pointed out that a statutory lien is separate and distinct from the underlying debt, and only affords a cumulative remedy for enforcement of that debt. Thus, recovery under the MMLL is not an unpaid subcontractor's sole remedy. See N.J.S.A. 2A:44-127 ("Nothing in [the MMLL] shall affect or impair the right of a creditor for labor

performed or materials furnished to maintain an action to recover such debt against the person liable therefor.").

Our courts have found that statutes that prohibit levy and execution, similar to Section 127 of the CIAL, permit enforcement by writ of mandamus. See First Nat'l Bank of Chicago v. Bridgeton Mun. Port Auth., 338 N.J. Super. 324, 329 (App. Div. 2001) (N.J.S.A. 40:68A-60 permits enforcement of bank loans in action in lieu of prerogative writs for mandamus); Jersey Cent. Power & Light Co. v. Kingsley Arms, Inc., 271 N.J. Super. 68, 80 (Law Div.) (creditor barred from execution on housing authority's bank accounts under N.J.S.A. 40A:12A-34, but "appropriate remedy to obtain satisfaction of its judgments" existed "in the form of an action in lieu of prerogative writs"), supplemented, 273 N.J. Super. 607 (Law Div. 1993).

In this light, we hold that the lien notice filed by MasTec against the MCIA is not valid under N.J.S.A. 40:37A-90 and affirm the trial court's order dismissing MasTec's lien foreclosure complaint.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION